## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

In re:                                              Case No. 13-37090-RBR

JOSEPH GOPIN and
ROCHEL RODMAN,                                       Chapter 7

     Debtors.
_____/

KENNETH A. WELT, Chapter 7 Trustee,                 Adv. Pro. No._____

     Plaintiff,

v.

**YGSL HOLDINGS, LLC,** a dissolved Florida limited
liability company, **CSSY OF FLORIDA, INC.,**
a Florida Non-Profit Corporation, **CYM
HOLDINGS, LLC,** a Florida limited liability
company, **M&M CHOW, LLC,** a Florida limited
liability company, **1019 LINCOLN LLC**, a dissolved
Florida limited liability company, **8100 BAIS CHAYA,
INC.,** a Florida non-profit corporation, **MORDECHEI
KORF,** an individual **MENACHAM KORF,** an individual,
**ERICA KORF,** an individual, **ZALMAN KORF,**
an individual, **SHMUEL LEVY,** an individual,
and **CHAIM MENDELSOHN,** an individual,

     Defendants.
_____/

## COMPLAINT TO DETERMINE ESTATE'S INTEREST, TO AVOID AND RECOVER FRAUDULENT TRANSFERS AND FOR OTHER RELIEF

     Plaintiff, Kenneth A. Welt, the duly appointed chapter 7 trustee ("Plaintiff" or "Trustee"),

by and through undersigned counsel, sues YGSL Holdings, LLC, CSSY of Florida, Inc., CYM

Holdings, LLC, M&M Chow, LLC, 1019 Lincoln, LLC, 8100 Bais Chaya, Inc., Mordechei Korf,

Menacham Korf,, Erica Korf, Zalman Korf, Shmuel Levy, and Chaim Mendelsohn, pursuant to

1

11 U.S.C. §§ 544, 548, 550, Fla. Stat. 726 *et seq.*, and Bankruptcy Rule of Procedure 7001 and alleges:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b).

2.      This is a core proceeding which the Court is authorized to hear, determine and enter final orders in accordance with 28 U.S.C. §157(b)(1), (b)(2)(A), (H) and (O).  Further, the Trustee consents to the entry of final orders and judgment by the Bankruptcy Court in accordance with Fed.R.Bankr. P. 7008(a).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1409 as the main bankruptcy case of Joseph Gopin ("Gopin") and Rochel Rodman ("Rodman") (collectively, the "Debtors") is pending in this district.

## PARTIES

4.      Plaintiff is over the age of eighteen (18) years, and the duly appointed chapter 7 trustee for the bankruptcy estate of the Debtors.

### *The Kosher Central Entities*

5.      YGSL Holdings, LLC ("YGSL"), is a dissolved Florida limited liability company, with its principal address located at 5650 Stirling Road, #20, Hollywood, Florida, 33021. According to the records of the Division of Corporations for Florida Department of State, YGSL is currently the owner of a fictitious company operating under the name "Kosher Central."

6.      CSSY of Florida, Inc. ("CSSY"), is a dissolved Florida a non-profit corporation, with its principal address located at 821 N. Federal Highway, Hallandale, Florida 33009.  CSSY served as a managing member of YGSL before being replaced by Gopin on or about January 6, 2010.

2

7.      CYM Holdings, LLC ("CYM"), is a dissolved Florida limited liability company, with its principal address located at 5650 Stirling Road, Hollywood, FL 33021.  According to the records of the Division of Corporations for Florida Department of State, CYM is currently the owner of a fictitious company operating under the name "Kosher Central Market & Catering."

8.      M&M Chow, LLC ("M&M"), is a Florida limited liability company, with its principal address located at 1257 Alton Road, Suite 2, Miami Beach, FL 33139.  According to the records of the Division of Corporations for Florida Department of State, M&M is currently the owner of a fictitious company operating under the name "Kosher Central."

### *1019 Lincoln*

9.      1019 Lincoln, LLC ("1019 Lincoln"), is a dissolved Florida limited liability company.

10.     Zalman Korf ("Zalman"), is an individual, *sui juris*, and is the manager of 1019 Lincoln. Upon information and belief, Zalman is a resident of Broward County.

### *Insiders - The Korf Family*
### *(Kosher Central, Homestead and 1019 Lincoln)*

11.     Mordechei Korf ("Mordechei"), is an individual, *sui juris*, and serves as the managing member of M&M. Upon information and belief, Mordechei is a resident of Miami-Dade County.

12.     Erica Korf ("Erica"), is an individual, *sui juris*, and is currently a manager of M&M.  Upon information and belief, Erica is a resident of Miami-Dade County.

13.     Menacham Korf ("Menacham"), is an individual, *sui juris*, and was the prior manager of M&M. Upon information and belief, Menacham is a resident of Miami-Dade County.

*Other Insiders – Kosher Central*

14.     Shmuel Levy ("Levy"), is an individual, *sui juris*, and served as a managing member of YGSL. Levy is the brother-in-law of Gopin, and was allegedly a fifty percent (50%) owner of YGSL before selling his interest to Gopin. Upon information and belief, Levy is a resident of New York.

15.     Chaim Mendelsohn ("Mendelsohn") is an individual, *sui juris*, and was the managing member of CYM. Upon information and belief, Mendelsohn is a resident of Broward County.

## SUMMARY OF FACTS AND RELIEF SOUGHT

16.     After the Harlem Suites Judgment (defined hereinafter) was entered in July 2010, Gopin devised a plan wherein he would transfer legal ownership of his assets to other entities or individuals, many of whom were affiliated with Gopin through their mutual involvement in the Chabad of Walnut Creek, a synagogue and Jewish community center, including but not limited to brothers Mordechai Korf and Zalaman Korf (the "Walnut Creek Insiders").

17.     The transfers relevant to this Complaint include: (a) an ownership interest in Kosher Central, a kosher supermarket, full service caterer, butcher and bakery located in Broward County, Florida; (b) real property located at 1895 NW 76th Way, Hollywood, Florida ("the Homestead"); and (c) real property located at 1019 Lincoln Place, Brooklyn, New York (the "1019 Lincoln Property").

18.     Upon information and belief, the Walnut Creek Insiders have agreed to and have participated in defrauding Gopin's creditors – the transactions detailed herein were designed to create the appearance of arms'-length transactions, but were fabricated transactions between Gopin and the Defendants that enabled Gopin to maintain control of his significant assets while evading claims of creditors.

19.     The Trustee is seeking a determination that the Debtor is the true owner of Kosher Central.  In the alternative, the Trustee is seeking to avoid and recover the Debtor's transfer of Kosher Central to M&M with the actual intent to hinder, delay or defraud his creditors, and for less than reasonably equivalent value.

20.     In addition, the Trustee is seeking to avoid and recover the Debtor's transfer of real property located at 1019 Lincoln Place, Brooklyn, New York.

## FACTS COMMON TO ALL COUNTS

### *Bankruptcy Cases*

21.     On November 11, 2013 (the "Petition Date"), the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code commencing case no: 13-37090-RBR (the "Main Case").

22.     On the Petition Date, the Debtors filed their schedules and statement of financial affairs (the "Schedules").  *See* Main Case, ECF No. 1.

23.     The Schedules reflects debt owed by the Debtors to, among others, Harlem Suites, Nickey Gregory, Bank of America, NA, US Bank, NA and the Debtors' chapter 11 bankruptcy counsel. *See* Main Case, ECF No. 1, schedules D and F.

24.     On March 20, 2014 and April 7, 2014, the Trustee conducted a Rule 2004 examination of the Debtors (the "2004 Examination"). *See* Main Case, ECF Nos. 50 and 57.

25.     On May 7, 2014, Harlem Suites filed its *Verified Complaint of Harlem Suites, LLC, Objecting to Dischargeability of Debt Pursuant to 11 U.S.C. §523(a)(2)(B)* against Gopin (the "Harlem Suites Complaint"). *See* Main Case, ECF No. 66.

26.     On May 9, 2014, creditor, Nickey Gregory filed *Creditor Nickey Gregory Company of Miami, LLC's Adversary Complaint to Except Discharge of PACA Trust Debt* against Gopin (the "Nickey Gregory Complaint"). *See* Main Case, ECF No. 67.

## BUSINESS DEALINGS AND DEBT

### *231 Norman Avenue - Harlem Suites, LLC Investment*

27.    Upon information and belief, prior to moving to Florida, in or about 2005, Gopin was involved in real estate development, including, but not limited to real property located at 231 Norman Avenue, in Brooklyn, New York ("Norman Avenue").

28.    In or around March 2005, 231 Norman Avenue Property Development, LLC entered into an operating agreement with Gopin and others to finance and develop Norman Avenue pursuant to that certain *Construction Agreement* dated March 4, 2005 (the "Construction Agreement"). A copy of the Construction Agreement is attached as **Exhibit 1**.

29.    The Construction Agreement contained the personal guaranty of Gopin, along with several others, in connection with a loan[1] from Harlem Suites, LLC ("Harlem Suites") provided to 231 Norman Avenue Property Development. *See* Construction Agreement, p. 3.

30.    Gopin and the guarantors failed to make payments, and on July 13, 2010 Harlem Suites was awarded a final judgment against Gopin and the other guarantors in the amount of $1,525,759.00 (the "Harlem Suites Judgment"). A copy of the Harlem Suites Judgment is attached as **Exhibit 2**.

31.    The Harlem Suites Judgment was domesticated in the State of Florida and then recorded in the public records of Broward County, Florida, on March 16, 2011.

32.    Upon information and belief, once the Harlem Suites Judgment was entered, Gopin began strategizing to shield his assets from creditors and started transferring real property and business interests to insiders.

33.    According to Proof of Claim No. 1 filed in the Debtors' main bankruptcy case, Harlem Suites is owed $2,235,550.45.

---

[1] The funds were initially provided as a capital contribution, which, upon information and belief, Harlem Suites exercised an option to convert the capital contribution(s) to a loan.

### Hallandale Farmers Market, LLC

34.     Shortly after Gopin signed the Construction Agreement where he guaranteed the loan with Harlem Suites, and shortly after moving to the State of Florida, in or about 2006, Gopin started another business operating as the "Hallandale Farmer's Market."

35.     The legal entity for Hallandale Farmer's Market was Hallandale Farmers Market, LLC ("Hallandale Market"), located at 821 N. Federal Highway, Hallandale, Florida, 33009.

36.     Upon information and belief, at all times during its existence, Gopin controlled owned and operated the Hallandale Market.

37.     As the owner and operator, Gopin continued to accrue numerous debts, including but not limited to debts owed to creditors, Sun Commodities Inc. and Nicky Gregory, both of whom have filed adversary complaints against the Debtor.

38.     Upon information and belief, Gopin ceased operations of Hallandale Market in or around 2011.

39.     On June 17, 2011, the County Court of the Seventeenth Judicial Circuit in and for Broward County, Florida, entered a *Final Judgment for Removal of Tenant* against the Hallandale Market, evicting Gopin from the premises located at 821 N. Federal Highway, Hallandale, Florida 33009.

40.     Further, on or around March 14, 2012, Nicky Gregory ("Gregory") obtained a final judgment (the "Gregory Judgment") against Gopin and Hallandale Market in the amount of $85,424.35.

41.     In an effort to forestall post-judgment discovery, Gopin negotiated settlement of the Gregory Judgment whereby he agreed to pay an aggregate of $100,000.00 to be made in installment payments. A copy of the referenced settlement is attached as **Exhibit 3**.

42.     Predictably, Gopin defaulted on the settlement agreement, and in December 2012 Gregory obtained another judgment against Gopin in the amount of $100,000.00.

43.     Upon information and belief, as of the Petition Date, Gopin did not make any attempt to satisfy the Gregory judgment.

### *Debtor's Interest in Kosher Central*

44.     Upon information and belief, after Hallandale Market ceased operations, Gopin transferred the assets and inventory of Hallandale Market to a new business venture, YGSL Holdings, LLC, a Florida limited liability company doing business as Kosher Central Market/Carmel Bakery ("Kosher Central"), a supermarket, deli, bakery and catering company, located at 5650 Stirling Road, Hollywood, Florida 33021.

45.     Upon information and belief, Gopin is the founder and owner of Kosher Central. Kosher Central maintains a website located at www.koshercentral.com, where Gopin holds himself out as the founder and CEO of Kosher Central.  An excerpt of the first two pages of Kosher Center's catering menu is attached as **Exhibit 4**.

46.     At some point, Defendant Shmuel Levy became a 50% owner of Kosher Central.

47.     On or about August 13, 2010, Levy and Gopin entered into an agreement pursuant to which Gopin would: (a) purchase Levy's fifty percent (50%) ownership interest in Kosher Central to Gopin for $110,000.00, and (b) assume $50,000 of debt (the "YGSL Agreement").

48.     As a result of the YGSL Agreement, Gopin became the 100% owner of Kosher Central.

49.     In 2011, Levy filed an action against asserting that Gopin repudiated the YGSL Agreement and failed to make payments required under the agreement. Levy sought a temporary injunction and/or the appointment of a receiver. See *Request for Temporary Injunction and/or Appointment of Receiver* attached as **Exhibit 5**.

50.     Under penalty of perjury, Levy asserted that after Gopin agreed to purchase Levy's interest, Gopin "solicited investors to purchase [Kosher Central], resulting in [Gopin] receiving over three hundred thousand dollars ($300,000.00) for [Gopin's] sale of an interest in [Kosher Central]."

51.     According to Levy's allegations, "[Gopin] has made multiple fraudulent transfers of the funds (in excess of two hundred and fifty thousand dollars ($250,000.00) invested by the investors in an attempt to make [Kosher Central] insolvent and defraud [Levy] of [his] interest in [Kosher Central]."

52.     For reasons unknown, the case was dismissed when the parties failed to appear at a mandatory case management conference on September 19, 2012.

53.     Upon information and belief, Gopin has, at all times, retained his ownership interest in Kosher Central.

54.     A review of Gopin's bank statements reflects that he receives significant compensation from Kosher Central in amounts that are not consistent or paid on a regular basis.

55.     While Gopin testified at his 2004 examination testified that he is a 1099 employee of Kosher Central, records received from Kosher Central's payroll company do not indicate that Gopin was ever an "employee" or that he was paid in the same fashion as other recipients of 1099 income from Kosher Central.

56.     Gopin also testified at his 2004 examination that Kosher Central uses and pays for a Mitsubishi truck that he owns, which is not typical of a 1099 employee.

### *Transfer of Kosher Central to M&M Chow, LLC*

57.     Subsequent to becoming a judgment debtor of Harlem Suites, on or around March 11, 2011, Gopin transferred his interest in Kosher Central to M&M via a collateral assignment of lease (the "Assignment of Lease").  A copy of the Assignment of Lease is attached as **Exhibit 6**.

58.    The Assignment of Lease was signed by Chaim Mendelsohn and allegedly executed to secure promissory notes for monies allegedly loaned by M&M to Kosher Central.[2]

59.    Although the Assignment of Lease creates the appearance that M&M loaned money to Kosher Central, Gopin has failed to provide the Plaintiff with any evidence that M&M provided any funds to Kosher Central.

60.    In 2012, M&M initiated litigation in the Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County, styled M&*M Chow LLC vs. YGSL Holdings LLC, and Chaim Mendelsohn,* Case No: 12-43989 CA 02 (the "M&M Action").

61.    On January 3, 2013, M&M obtained a final judgment against Kosher Central in the amount of $1,673.968.07 (the "M&M Judgment").

62.    Upon information and belief, Gopin intentionally enabled M&M to obtain possession of the assets of Kosher Central (the "M&M Transfer").

63.    Upon information and belief, the M&M Transfer was a strategic fraudulent transfer whereby Walnut Creek Insider, Morechai Korf, acquired Gopin's legal interest in Kosher Central, for no consideration, in order to allow Gopin to shield his assets from the ever-increasing demands of creditors.

64.    Despite the fact that Gopin (through Kosher Central) is allegedly indebted to M&M, the Walnut Creek Insiders have continued to operate the business as "Kosher Central" and Gopin has continued his operation of the business, only now as a "manager" that is allegedly paid on a 1099 basis.

---

[2] According to the Assignment of Lease, M& M provided initial funding of $150,000.00 and was to issue additional promissory notes totaling "more than $1,000,000."The Trustee has not received any documents or other information confirming any loan proceeds from M&M.

*Homestead*

65.     Sometime after Gopin incurred debt to Harlem Suites, he and Rodman (his wife and co-debtor) moved to the State of Florida, and on March 14, 2007, the Debtors purchased real property located at 1895 NW 76th Way, Hollywood, Florida (the "Homestead") for $435,000.00.

66.     Additionally, on or around December 2010, shortly after the entry of the Harlem Suites Judgment, the Debtors transferred the Homestead to Defendant Zalman Korf.

67.     Zalman Korf allegedly paid $260,000.00 in consideration for the obtaining title to Gopin's Homestead.

68.     The Debtors have failed to provide any documentation regarding the disbursement of funds received for the "sale" of the Homestead.

69.     Gopin testified at the 2004 Examination that the proceeds of the sale went to satisfy the Bank of America ("BOA") mortgages on the Homestead.

70.     However, the Trustee's review of the public records of Broward County, Florida, reflects that the two mortgages held by BOA remain unsatisfied.

71.     Since the "transfer" of the Homestead, the Debtors lease the property from the Korfs and continued to reside at the premises.

72.     Gopin testified at the 2004 exam that he leases the Homestead from Zalman Korf; however, rather than paying Korf rent, Gopin is making mortgage payments directly to Zalman Korf's lender, in the amount of $2,170.54 a month. In essence, Gopin still retains possession of the Homestead and pays a mortgage on such property all without having to have the property or mortgage in his name.

73.     Under the aforementioned facts, Gopin is receiving income from M&M, a company owned by Mordechai Korf, and is using his compensation to pay off a mortgage on the

Homestead (taken out by Mordechai's brother, Zalman), all while retaining control of both Kosher Central and the Homestead and managing to evade claims of creditors.

*1019 Lincoln Property*

74.     On May 21, 2003, Gopin purchased the 1019 Lincoln Property for $351,063.00. A copy of the deed evidencing the purchase is attached as **Exhibit 7**.

75.     On December 19, 2012—a mere 7 days after Gregory obtained its judgment, Gopin transferred the 1019 Lincoln Property to 1019 Lincoln LLC, a Florida limited liability company, for $10,000.00 (the "**1019 Transfer**"). A copy of the quit claim deed evidencing the 1019 Transfer is attached as **Exhibit 8**.

76.     According to the public records maintained by the Florida Secretary of State, the registered agent and manager of 1019 Lincoln LLC is Zalman Korf, the same individual who purchased the Homestead and is the Debtors' current landlord.

77.     The estimated value of the 1019 Property at the time of the 1019 Transfer was $648,000, as reported on the Final Assessment Roll for 2013 prepared by the Department of Finance for the State of New York.

78.     The Trustee requested, but the Debtors did not provide, any proof that they received the $10,000 in exchange for the 1019 Transfer.

79.     Zalman Korf was the beneficiary of the 1019 Transfer which was made by the Debtors for approximately $638,000.00 less than fair market value.

80.     On April 29, 2013, 1019 Lincoln LLC transferred the 1019 Lincoln Property back to Gopin for no consideration.

81.     The same day, Gopin transferred the 1019 Property to Defendant 8100 Bais Chaya, Inc. for an alleged purchase price of $430,000.00 (the "**8100 Transfer**").

82.     On or about January 17, 2014, 8100 Bais Defendant Chaya, Inc. sold the 1019 Lincoln Property to Alexander and Svetlana Perez, husband and wife, for $770,000.00.

**COUNT 1**
**Declaratory Relief**

83.     The Trustee re-alleges and restates the allegations made in paragraphs 1 through 82 of the Complaint as if fully restated herein.

84.     This is a claim for declaratory relief, pursuant to Bankruptcy Rule 7001, 11 U.S.C. § 541, 28 U.S.C. § 2201, Chapter 86, Florida Statutes, and other applicable law, to determine the validity, priority or extent of the estate's interest in the business operating as Kosher Central and Carmel Bakery.

85.     Defendant M&M may assert that it owns the business and related assets of Kosher Central and Carmel Bakery.

86.     Defendant CSSY of Florida, Inc. may assert that it owns the business and related assets of Kosher Central and Carmel Bakery.

87.     Defendant CYM Holdings, LLC may assert that it owns the business and related assets of Kosher Central and Carmel Bakery.

88.     Defendant Mordechai Korf may assert that he owns the business and related assets of Kosher Central and Carmel Bakery.

89.     Defendant Erica Korf may assert that she owns the business and related assets of Kosher Central and Carmel Bakery.

90.     Defendant Menacham Korf may assert that he owns the business and related assets of Kosher Central and Carmel Bakery.

91.     Defendant Shmuel Levy may assert that he owns the business and related assets of Kosher Central and Carmel Bakery.

13

92.     Defendant Chaim Mendelsohn may assert that he owns the business and related assets of Kosher Central and Carmel Bakery.

93.     The Trustee believes the estate owns some or all the ownership interests in Kosher Central and Carmel Bakery.

94.     There is an actual controversy over the rights of the parties regarding the ownership interests in Kosher Central and Carmel Bakery.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment declaring that the estate has an interest in some or all of Kosher Central and Carmel Bakery, determining the extent of the estate's interest, directing turnover of estate's interest or the value thereof and awarding any other relief the Court deems appropriate.

**In the Alternative, <u>COUNT 2</u>**
**<u>Avoidance of Transfer of Kosher Central to M&M</u>**
**<u>Pursuant to 11 U.S.C. § 548(a)(1)(A)</u>**

95.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

96.     If the Court determines that the estate does not have an interest in Kosher Central as of the Petition Date, this count seeks the avoidance of the transfer of the Debtor's interest in Kosher to M&M (the "M&M Transfer").

97.     The Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted …" 11 U.S.C. § 548(a)(1)(A).

14

98.     The M&M Transfer constitutes a transfer of an interest in property of the Debtor made within two years before the Petition Date.

99.     Gopin made the M&M Transfer with the actual intent to hinder, delay, or defraud his creditors to whom Gopin was or became obligated, on or after the date of the M&M Transfer.

100.    As a result of the M&M Transfer, the Plaintiff has been damaged for the total value of the business transferred.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against M&M: (i) avoiding all or part of M&M Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided M&M Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) M&M may have against the Debtor until such time M&M pays the value of the M&M Transfer pursuant to 11 U.S.C. §502(d); and (v) awarding any other relief the Court deems appropriate.

**In the alternative, <u>COUNT 3</u>**
**Avoidance of Fraudulent Transfer**
**<u>Pursuant to 11 U.S.C. § 548(a)(1)(B)</u>**

101.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

102.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the Debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation for the benefit of an insider, under an employment contract and not in the ordinary course of business.

103.     The M&M Transfer (defined in Count 2 above) constitute transfers of an interest in property of the Debtor to Defendant M&M within two years prior to the Petition Date.

104.     The Debtor received less than a reasonably equivalent value in exchange for the M&M Transfer because among other things, the Debtor received nothing in return for having made the M&M Transfer.

105.     The Debtor was insolvent on the date that the M&M Transfer was made, or was rendered insolvent because of the M&M Transfer, up to and through the Petition Date.

106.     At the time of the M&M Transfer, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

107.     The Debtor intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as such debts matured.

108.     As evidenced by the schedules and proofs of claim filed in this bankruptcy case, multiple creditors existed prior to the Petition Date that would have been entitled to avoid the transfers.

109.     As a result of the M&M Transfer, the Plaintiff has been damaged for the total value of the business transferred during the two year period.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against the Defendant: (i) avoiding all or part of the M&M Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided M&M Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) the Defendant may have against the Debtor until such time the Defendant pays the M&M Transfer asserted herein pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

### COUNT 4
### Avoidance of Fraudulent Transfer of 1019 Property
### Pursuant to 11 U.S.C. § 548(a)(1)(A)
### (1019 Lincoln LLC)

110.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

111.    This count seeks the avoidance of the transfer of the Debtor's interest in 1019 Property to 1019 Lincoln LLC (the "1019 Transfer").

112.    The Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted …" 11 U.S.C. § 548(a)(1)(A).

113.    The 1019 Transfer constitutes a transfer of an interest in property of the Debtor made within two years before the Petition Date.

114.     Gopin made the 1019 Transfer with the actual intent to hinder, delay, or defraud his creditors to whom Gopin was or became obligated, on or after the date of the 1019 Transfer.

115.     As a result of the 1019 Transfer, the Plaintiff has been damaged for the total value of the property transferred.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant 1019 Lincoln LLC (i) avoiding all or part of 1019 Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided 1019 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) 1019 Lincoln LLC may have against the Debtor until such time 1019 Lincoln LLC or Zalman Korf pays the value of the 1019 Transfer pursuant to 11 U.S.C. §502(d); and (v) awarding any other relief the Court deems appropriate.

**COUNT 5**
**Avoidance of Fraudulent Transfer of 1019 Property**
**Pursuant to 11 U.S.C. § 548(a)(1)(B)**
(1019 Lincoln LLC)

116.     Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

117.     Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the Debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>
> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to

engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation for the benefit of an insider, under an employment contract and not in the ordinary course of business.

118.    The 1019 Transfer (defined in Count 4 above) constitute transfers of an interest in property of the Debtor to Defendant 1019 Lincoln LLC within two years prior to the Petition Date.

119.    The Debtor received less than a reasonably equivalent value in exchange for the 1019 Transfer because among other things, the Debtor received nothing in return for having made the 1019 Transfer.

120.    The Debtor was insolvent on the date that the 1019 Transfer was made, or was rendered insolvent because of the 1019 Transfer, up to and through the Petition Date.

121.    At the time of the 1019 Transfer, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

122.    The Debtor intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as such debts matured.

123.    As evidenced by the schedules and proofs of claim filed in this bankruptcy case, multiple creditors existed prior to the Petition Date that would have been entitled to avoid the transfers.

124.    As a result of the 1019 Transfer, the Plaintiff has been damaged for the total value of the business transferred during the two year period.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant 1019 Lincoln LLC: (i) avoiding all or part of the 1019 Transfer; (ii) ordering and

directing the payment of a monetary award in the amount of the avoided 1019 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) 1019 Lincoln LLC may have against the Debtor until such time 1019 Lincoln LLC pays the 1019 Transfer asserted herein pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

## COUNT 6
### Avoidance of Fraudulent Transfer of 1019 Property
### Pursuant to 11 U.S.C. § 548(a)(1)(A)
### (8100 Bais Chaya Inc.)

125.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

126.    This count seeks the avoidance of the transfer of the Debtor's interest in the 1019 Property to 8100 Bais Chaya, Inc. (previously defined as the "8100 Transfer").

127.    On or about April 29, 2013, Gopin transferred the 1019 Property to Defendant 8100 Bais Chaya, Inc. for an alleged purchase price of $430,000.00.

128.    The Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the debtor voluntarily or involuntarily "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted …" 11 U.S.C. § 548(a)(1)(A).

129.    The 8100 Transfer constitutes a transfer of an interest in property of the Debtor made within two years before the Petition Date.

130.    Gopin made the 8100 Transfer with the actual intent to hinder, delay, or defraud his creditors to whom Gopin was or became obligated, on or after the date of the 8100 Transfer.

131.    As a result of the 8100 Transfer, the Plaintiff has been damaged for the total value of the property transferred.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant 8100 Bais Chaya Inc.: (i) avoiding all or part of 8100 Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided 8100 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) 8100 Bais Chaya Inc. may have against the Debtor until such time 8100 Bais Chaya Inc. pays the value of the 8100 Transfer pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

### COUNT 7
### Avoidance of Fraudulent Transfer of 1019 Property
### Pursuant to 11 U.S.C. § 548(a)(1)(B)
### (8100 Bais Chaya Inc.)

132.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

133.    On or about April 29, 2013, Gopin transferred the 1019 Property to Defendant 8100 Bais Chaya, Inc. for an alleged purchase price of $430,000.00.

134.    Pursuant to 11 U.S.C. § 548(a)(1)(B), the Trustee may avoid any transfer of an interest of the Debtor in property, or any obligation incurred by the Debtor, that was made or incurred on or within two (2) years before the date of the filing of the petition, if the Debtor voluntarily or involuntarily:

> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or (IV) made such transfer to or for the benefit of an insider, or incurred such obligation for the benefit of an insider, under an employment contract and not in the ordinary course of business.

135.    The 8100 Transfer (defined hereinabove) constitutes a transfer of an interest in property of the Debtor to Defendant 8100 Bais Chaya Inc. within two years prior to the Petition Date.

136.    The Debtor received less than a reasonably equivalent value in exchange for the 8100 Transfer because among other things, the Debtor received nothing in return for having made the 8100 Transfer.

137.    The Debtor was insolvent on the date that the 8100 Transfer was made, or was rendered insolvent because of the 8100 Transfer, up to and through the Petition Date.

138.    At the time of the 8100 Transfer, the Debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital.

139.    The Debtor intended to incur, or believed that he would incur, debts that would be beyond his ability to pay as such debts matured.

140.    As evidenced by the schedules and proofs of claim filed in this bankruptcy case, multiple creditors existed prior to the Petition Date that would have been entitled to avoid the 8100 Transfer.

141.    As a result of the 8100 Transfer, the Plaintiff has been damaged for the total value of the business transferred during the two year period.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant 8100 Bais Chaya Inc.: (i) avoiding all or part of 8100 Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the avoided 8100 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) 8100 Bais Chaya Inc. may have against the Debtor until such time 8100 Bais Chaya Inc. pays the value of the 8100 Transfer pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

**In The Alternative, COUNT 8**
**Recovery of Avoided M&M Transfer**
**<u>Pursuant to 11 U.S.C. § 550(a)</u>**

142.   Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

143.   If the Trustee prevails on Count 2 or 3 to avoid the M&M Transfer, the Trustee may recover the M&M Transfer or the value thereof, from – (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550.

144.   M&M was the initial transferee of the M&M Transfer and the entity for whose benefit such transfer was made.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against M&M: (i) ordering and directing the payment of a monetary award in the amount of the avoided M&M Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (ii) disallowing any claim(s) M&M may have against the Debtor until such time that M&M pays the M&M Transfer asserted herein

pursuant to §502(d) of the Bankruptcy Code; and (iii) awarding any other relief the Court deems appropriate.

**COUNT 9**
**Recovery of Avoided 1019 Transfer**
**Pursuant to 11 U.S.C. § 550(a)**
**(1019 Lincoln LLC)**

145.   Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

146.   If the Trustee prevails on Count 4 or 5 to avoid the 1019 Transfer, the Trustee may recover the 1019 Transfer or the value thereof, from: (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550.

147.   1019 Lincoln LLC was the initial transferee of the 1019 Transfer.

148.   Zalman Korf was the entity for whose benefit such transfer was made.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against 1019 Lincoln LLC and Zalman Korf: (i) ordering and directing the payment of a monetary award in the amount of the avoided 1019 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (ii) disallowing any claim(s) 1019 Lincoln LLC and Zalman Korf may have against the Debtor until such time that 1019 Lincoln LLC and/or Zalman Korf pays the value of the 1019 Transfer asserted herein pursuant to §502(d) of the Bankruptcy Code; and (iii) awarding any other relief the Court deems appropriate.

## COUNT 10
### Recovery of Avoided 8100 Transfer
### Pursuant to 11 U.S.C. § 550(a)
### (8100 Bais Chaya Inc.)

149.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

150.    If the Trustee prevails on Count 6 or 7 to avoid the 8100 Transfer, the Trustee may recover the 8100 Transfer or the value thereof, from: (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee.  11 U.S.C. § 550.

151.    8100 Bais Chaya Inc. was the initial transferee of the 8100 Transfer and the entity for whose benefit the 8100 Transfer was made.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against 8100 Bais Chaya Inc.: (i) ordering and directing the payment of a monetary award in the amount of the avoided 8100 Transfer, plus such additional amounts and property as may be discovered through these proceedings, together with accrued pre-judgment interest; (ii) disallowing any claim(s) 8100 Bais Chaya may have against the Debtors until such time that 8100 Bais Chaya Inc. pays the value of the 8100 Transfer asserted herein pursuant to §502(d) of the Bankruptcy Code; and (iii) awarding any other relief the Court deems appropriate.

## COUNT 11
### Unjust Enrichment (M&M)

152.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

153.    This is a claim for unjust enrichment under Florida law.

154.    The Debtor conferred a benefit on Defendant M&M by making the M&M Transfer without any resulting value or benefit being received by the Debtor.

25

155.    Defendant M&M knowingly and voluntarily accepted and retained the benefit conferred by the Debtor.

156.    The circumstances are such that it would be inequitable and unjust for Defendant M&M to retain the benefit conferred by the Debtor without paying the Plaintiff the value thereof.

157.    Defendant M&M has been unjustly enriched to the detriment of the Debtor's creditors and the Debtor's bankruptcy estate.

158.    The Plaintiff is entitled to the return of those amounts to which Defendant M&M was unjustly enriched through the imposition of an equitable lien on the assets of Kosher Central, disgorgement or any other appropriate remedy.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant M&M: (i) finding that Defendant M&M was unjustly enriched as a result of the M&M Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the M&M Transfer, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) Defendant M&M may have against the Debtor until such time M&M pays the M&M Transfer pursuant to 11 U.S.C. § 502(d); (v) imposing an equitable lien on the assets of Kosher Central; and (vi) awarding any other relief the Court deems appropriate.

## COUNT 12
## Unjust Enrichment (1019 Lincoln LLC and Zalman Korf))

159.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

160.    This is a claim for unjust enrichment under Florida law.

161.    The Debtor conferred a benefit on Defendants 1019 Lincoln LLC and Zalman Korf by making the 1019 Transfer without any resulting value or benefit being received by the Debtor.

162.    Defendants 1019 Lincoln LLC and Zalman Korf knowingly and voluntarily accepted and retained the benefit conferred by the Debtor.

163.    The circumstances are such that it would be inequitable and unjust for Defendants 1019 Lincoln LLC and Zalman Korf to retain the benefit conferred by the Debtor without paying the Plaintiff the value thereof.

164.    Defendants 1019 Lincoln LLC and Zalman Korf have been unjustly enriched to the detriment of the Debtor's creditors and the Debtor's bankruptcy estate.

165.    The Plaintiff is entitled to the return of those amounts to which Defendants 1019 Lincoln LLC and Zalman Korf were unjustly enriched.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendants 1019 Lincoln LLC and Zalman Korf: (i) finding that Defendants 1019 Lincoln LLC and Zalman Korf were unjustly enriched as a result of the 1019 Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the 1019 Transfer, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) Defendants 1019 Lincoln LLC and Zalman Korf may have against the Debtor until such time 1019 Lincoln LLC and Zalman Korf pay the 1019 Transfer pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

## COUNT 13
### Unjust Enrichment (8100 Bais Chaya Inc.)

166.    Plaintiff hereby re-alleges every allegation in paragraphs 1 through 82 as if fully set forth herein.

167.    This is a claim for unjust enrichment under Florida law.

168.    The Debtor conferred a benefit on Defendant 8100 Bais Chaya Inc. by making the 8100 Transfer without any resulting value or benefit being received by the Debtor.

169.    Defendant 8100 Bais Chaya Inc. knowingly and voluntarily accepted and retained the benefit conferred by the Debtor.

170.    The circumstances are such that it would be inequitable and unjust for Defendant 8100 Bais Chaya Inc. to retain the benefit conferred by the Debtor without paying the Plaintiff the value thereof.

171.    Defendant 8100 Bais Chaya Inc. has been unjustly enriched to the detriment of the Debtor's creditors and the Debtor's bankruptcy estate.

172.    The Plaintiff is entitled to the return of those amounts to which Defendant 8100 Bais Chaya Inc. was unjustly enriched.

WHEREFORE, the Plaintiff respectfully requests the entry of judgment against Defendant 8100 Bais Chaya Inc.: (i) finding that Defendant 8100 Bais Chaya Inc.was unjustly enriched as a result of the 8100 Transfer; (ii) ordering and directing the payment of a monetary award in the amount of the 8100 Transfer, together with accrued pre-judgment interest; (iii) ordering the payment of all costs and expenses incurred in regard to this action; (iv) disallowing any claim(s) Defendant 8100 Bais Chaya Inc. may have against the Debtor until such time 8100

Bais Chaya Inc. pays the 8100 Transfer pursuant to 11 U.S.C. § 502(d); and (v) awarding any other relief the Court deems appropriate.

DATED: December 24, 2014        **MARKOWITZ RINGEL TRUSTY & HARTOG, P.A**.
*Counsel to the Plaintiff*
101 NE Third Avenue, Suite 1210
Fort Lauderdale, FL 33301
Tel: (954) 767-0030  //Fax: (954) 767-0035

- and –

9130 S. Dadeland Blvd.
Two Datran Center, Suite 1800
Miami, Florida 33156
Tel:  (305) 670-5000 // Fax: (305) 670-5011

By: /s/ *Grace E. Robson*
     Grace E. Robson, Esq.
     Fla. Bar No. 178063
     grobson@mrthlaw.com
     Adrian C. Delancy
     Florida Bar No. 75337
492752.2      adelancy@mrthlaw.com

**<u>Exhibit 1</u>**
**(Construction Agreement)**

## CONSTRUCTION AGREEMENT

THIS CONSTRUCTION AGREEMENT (the "Agreement") is executed effective as of the 4th day of March 2005, by and among 231 NORMAN AVENUE PROPERTY DEVELOPMENT, LLC (the "Company"), a limited liability company organized pursuant to the New York Limited Liability Law (the "LLC Law") with an address at 231 Norman Avenue, Brooklyn, NY 11222, HARLEM SUITES, LLC, a New York limited liability company with offices at 350 Fifth Avenue, Suite 5122, New York, NY 10118 ("Harlem Suites"), 231 NORMAN AVENUE, LLC, a New York limited liability company with offices at C/O David Yerushalmi, 231 Norman Avenue, Brooklyn, NY 11222 ("231 Norman"), Joseph Gopin, an individual with an address at 231 Norman Avenue, Brooklyn, NY 11222 ("Gopin"), David Yerushalmi, an individual with an address at 231 Norman Avenue, Brooklyn, NY 11222 ("David"), Jonathan Rigby an individual with an address at 231 Norman Avenue, Brooklyn, NY 11222 ("Jonathan"), and Jonathan Ilan Ofir an individual with an address at 231 Norman Avenue, Brooklyn, NY 11222 ("Ilan") 231 Norman, Gopin, David, Jonathan, and Ilan shall be referred to collectively as the "Yerushalmi Group". Harlem Suites, 231 Norman, David, Jonathan, Ilan and Gopin shall be referred to collectively as "Members". The parties named above may each be referred to as a "Party" and collectively the "Parties").

The Parties hereby agree to the following:

### ARTICLE I: GENERAL PROVISIONS.

1.1     Incorporation By Reference. Reference is hereby made to that certain operating agreement of 231 Norman Avenue Property Development, LLC of the Company, made as of the 4th day of March 2005 (the "Operating Agreement"). Said Operating Agreement is hereby incorporated into this Agreement by this reference as if fully set forth herein.

1.2     Governing Document. To the extent that this Agreement conflicts with, or contradicts, any term or provision of the Operating Agreement, the terms and provisions of this Agreement shall govern and control.

1.3     Definitions. Unless specifically defined herein, all defined terms within this Agreement shall have the identical meaning as in the Operating Agreement.

1.4     New Operating Agreement. The Parties hereby agree that on or before March 10, 2005, the operating agreement of the Company currently in effect shall be replaced by the new Operating Agreement attached hereto as Exhibit G.

### ARTICLE II: PURPOSE.

The Parties undertake to promote the purpose of the Company to accomplish the following (the "Project") in respect to the development of (i) that certain building consisting of approximately 58,000 (fifty-eight thousand) square feet currently owned by the Company; and (ii) that certain tract of land the deed to which is held by the Company, both which are located at 231 Norman Avenue, Brooklyn, New York 11222 also known as Section 9 Block 2629 and Lot

HS 40

39 (collectively the "Property"):

2.1    <u>Financing</u>.  Obtain financing (the "Financing") in accordance with the terms contained herein, as modified by the Company from time to time;

2.2    <u>Construction and Conversion</u>.    Renovate the Property pursuant to the certified architectural / engineering / construction plans dated August 27, 2004 (collectively the "Construction Plans"), a copy of which is incorporated herein by this reference and attached hereto as <u>Exhibit A</u> and further pursuant to the terms herein, and convert the Property into a condominium; and

2.3    <u>Sale or Rental</u>.  Sell or rent out the Property in accordance with the terms provided herein below.

### ARTICLE III: FINANCING.

3.1    <u>Loan</u>.  The Parties hereby acknowledge that the Yerushalmi Group, on behalf of the Company, has applied to Washington Mutual Bank ("WaMu") for a thirty (30) month, ten-million dollar (US$10,000,000) loan (the "Loan") under the terms detailed in a nine (9) page facsimile communication addressed from Meridian Capital Group to David Yerushalmi and certain agreements expected to be executed with WaMu, attached hereto as <u>Exhibit B</u>. The terms and conditions of the Loan are hereby deemed acceptable to all Parties.

3.2    <u>Condition Precedent</u>.  The Parties hereby agree and acknowledge that the validity and enforceability of this entire Agreement and its terms, conditions, rights, and obligations are all conditioned upon and subject to the successful closing of the WaMu Loan, contemplated to take place during March of 2005 (the "WaMu Closing").  Should the WaMu Closing fail, the provisions set forth in the frame-letter agreement executed by the parties on March 4, 2005 shall apply in respect to the validity of this Agreement.

3.3    <u>'Mezzanine' Financing</u>.  Upon signing of this Agreement, the Members shall each attempt to obtain additional financing for two (2) years in the amount of two-million dollars ($2,000,000) or more, carrying a maximum interest rate of fifteen percent (15%) per annum in any combination of interest rate and 'points'.

3.4    <u>Cooperation</u>. Each Party hereby agrees to cooperate fully with the Lender, including, without limitation,

3.4.1    provide and deliver any and all documentation, assistance and satisfy all requests, including without limitation accurate statements of its individual and corporate net worth, to enable and facilitate the success of the WaMu Closing ;

3.4.2    to the extent the Lender requires and the Board consents in writing, increase contributions into each Member's respective capital account in proportion to such Member's Membership Interest; and

2



HS 41

3.4.3   to the extent the Lender requires, grant and execute personal guarantee(s) as well as all related and necessary documents, in the Party's individual and/or corporate capacity.

3.5   Indemnification.   The Groups hereby undertake to (i) indemnify the other Group for expenses incurred and damages resulting from the failure of WaMu to proceed to the closing or from WaMu taking of an adverse action against the Company or any Party hereto due to any misrepresentation or breach by a Group of its obligations or representations towards WaMu; and (ii) promptly, in a pro-rata manner indemnify each other and participate in legal fees and expenses, if WaMu and/or the Lender takes adverse action in the matters of the Company against any Party(s) for any other cause. Notwithstanding anything to the contrary contained in this Agreement, Harlem Suites shall be jointly and severally indemnified by the members of Yerushalmi Group, and shall not have the obligation to indemnify any and all of the members of Yerushalmi Group, unless, and to the extent that, the Funds and all interest due thereon have been fully paid to Harlem Suites.

3.6   Capital Contributions.   Harlem Suites shall provide the Company with $1,750,000 (one-million seven-hundred and fifty-thousand US dollars) as capital at the WaMu Closing (the "Funds"). Such Funds shall bear ten percent (10%) interest per annum (such Funds, to the extent provided by Harlem Suites, and with all interest due thereon, shall hereinafter be referred to as the "HS Funds"). At the WaMu Closing, Yerushalmi Group shall contribute a similar amount as capital either by delivering such amount to the Company or by using previous capital infused to the Company, which shall bear ten percent (10%) interest per annum (the "YG Funds")

3.7   Liens and Encumbrances.   During the term of this Agreement, and so long as the HS Funds defined and referred to in Section 3.6 hereinabove have not been fully returned to Harlem Suites, the Yerushalmi Group shall retain their Membership Interests free and clear of all liens, encumbrances and rights of third parties.

3.8   Conversion of Capital Contribution to Loan.   The Parties hereby agree that Harlem Suites shall, in its sole and absolute discretion, have the right (but not the obligation), at any time subsequent to the WaMu Closing, to convert any and all capital contribution(s) made by Harlem Suites hereunder into a Member loan.

3.9   Return of Funds to Harlem Suites, Personal Guaranty.   Notwithstanding anything to the contrary contained in this Agreement, the Parties hereby acknowledge and agree, and each of the following: 231 Norman Avenue, LLC; Joseph Gopin; David Yerushalmi; Jonathan Ilan Ofir; and Jonathan Rigby (each a "Guarantor") hereby jointly and severally guarantees, warrants and represents, that, in any event, the HS Funds shall be fully returned to Harlem Suites, free and clear of any obligation or encumbrance and subject to no restriction, covenant, whether express or implied, or any other condition, no later than four (4) years from the date of this Agreement. Such undertaking shall survive perpetually and shall bind members of the Yerushalmi Group at any time in the future, should Harlem Suites, or any of its direct or indirect members be required to indemnify or compensate a lender or other third party. Each Guarantor shall execute the Guaranty attached hereto as Exhibit F.

3

HS 42

## ARTICLE IV: CONSTRUCTION AND CONVERSION

4.1    <u>Construction and Conversion, Generally</u>.  The Parties agree to cause the Property, via renovation and construction followed by conversion into a condominium in accordance with all applicable laws, rules, and regulations, to become a commercial condominium building consisting of commercial artist loft units, and ground-floor retail stores (the "Construction/Conversion").

4.2    <u>Construction/Conversion Schedule</u>.  The Construction/Conversion timeframe; budget (it being understood and agreed that such budget shall be elaborate and descriptive and shall include, without limitation, forecasted costs; timeframe(s); and a schedule designating all funds disbursements as payable only as against completion of the corresponding proportionate stage of the work); specifications; licenses, permits, and clearances required; condominium plan drafting and filing, detailed cost; and other relevant parameters, shall be set forth in a written Construction/Conversion Schedule (the "Construction/Conversion Schedule"), which shall be affixed to this Agreement as <u>Exhibit D.</u> Each Party hereby agrees to promptly approve the Construction/Conversion Schedule upon commercially-reasonable review.

4.3    <u>Total Estimated Project Cost</u>.  The Yerushalmi Group estimates that the total amount of funds necessary to complete the Project is $6,000,000 (six million dollars) (the "Total Estimated Project Cost"), based on the budget included in Exhibit D.  The members of the Yerushalmi Group shall be responsible for any and all cost(s) incurred in excess of the Total Estimated Project Cost, other than such cost(s) incurred directly due to (i) Force Majeure; (ii) an increase of more than 50% in the market price of steel, concrete or copper from the date hereof and to the extent of such increase; and/or (iii) a written decision of the majority of the Board.

4.4    <u>Out-Of-Pocket Expenses</u>.  All direct and documented out-of-pocket expenses previously paid to third-parties by the Yerushalmi Group incurred in the planning, design, and approval process of the Construction Plans, and in obtaining Financing, if and to the extent set forth on <u>Exhibit E</u> hereto or approved by the Board of the Company, shall be paid by the Company to the Yerushalmi Group within a commercially-reasonable time after the WaMu Closing.

4.5    <u>Supervision</u>.  Yerushalmi Group shall supervise the Construction/Conversion and the adherence to the Construction/Conversion Schedule. Such supervision shall include, among others, a daily on-site inspection by David Yerushalmi and/or Jonathan Rigby.  Yerushalmi Group shall (i) cause the Construction Committee to meet at least once every week to discuss the Project and its progress; and (ii) promptly upon request of the Construction Committee and no less than once every two weeks, provide the Board with a written report with respect to the Project and its progress.

4.6    <u>Liability</u>.  Yerushalmi Group shall report any and all material variance(s) from the Construction/Conversion Schedule to the Construction Committee as well as to all of the other Members as soon as such variance is discovered or can be reasonably anticipated, and shall be solely liable to the Company for damages to the Company caused by any such variance, subject to the exceptions set forth in Section 4.3 hereinabove.

4

HS 43



## ARTICLE V: SALE OR RENTAL.

5.1   Sale.

5.1.1   On or before the conclusion of the Project's Construction/Conversion in conformity with Exhibit D, the Parties intend to sell the units as individual units.

5.1.2   The minimum sale price for each unit, shall be as set forth in Exhibit A attached hereto.   Any variation from such minimum sale price shall require prior unanimous written consent of the Board.

5.1.3   Once the Property is declared to be registered as a legal condominium, each of the Parties shall have the right to move the Board, in the Board's unanimous written consent, to divide the condominium units between the Parties, in a manner proportionate with the Members' Membership Interests, it being understood and agreed that (i) Yerushalmi Group or any of its members shall only become entitled to make such motion subsequent to fully satisfying its obligation to secure the return of the HS Funds to Harlem Suites; and (ii) Harlem Suites making of such motion shall mean that Yerushalmi Group has fully satisfied its obligation to return the HS Funds to Harlem Suites. The parties shall obtain an Appraisal, as defined in the Operating Agreement, to reflect the value of the assets distributed to the parties, and the parties shall adjust the distribution of the property in accordance with the provisions of Section 6 hereunder.

5.2   Forced Sale. Each Party shall have the right to force the sale of the entire Property if:

5.2.1   during the first twelve (12) months from the date of this Agreement, such Party receives an offer to purchase the Property from a bona-fide purchaser which sale would result in a net profit (as such shall be computed by the Company's accountant) to the Company of $2 million (two million US Dollars) or more;

5.2.2   during the first twenty-four (24) months from the date of this Agreement, such Party receives an offer to purchase the Property from a bona-fide purchaser which sale would result, subject to the Right of First Refusal mechanism set forth in the Operating Agreement, in a net profit (as such shall be computed by the Company's accountant) to the Company of $3 million (three million US Dollars) or more; or

5.3   Rental. If the Members unanimously agree in writing, the Company may refrain from selling the Property or any part thereof, and instead offer the units (whether the retail units only or otherwise) for rent, for a period of time to be determined by the Board.

## ARTICLE VI: GROSS PROFIT DISTRIBUTION.

Distribution of the gross profits of the Company shall be as follows:

6.1   First, all expenses incurred shall be paid and a reserve amount, determined by the Board, shall remain intact or be replenished, as applicable.

HS 44

6.2     Second, return of the HS Funds until fully paid.  Further and in any event, each of the individuals and entities of the Yerushalmi Group shall, jointly and severally, personally guarantee the return of the HS Funds, in accordance with Section 3.9 hereinabove and the form of guaranty attached hereto as Exhibit F.

6.3     Third, return of the YG Funds until fully paid;

6.4     Fourth, distribution of profits to each Member pursuant to the formula and related descriptions and definitions attached hereto as Exhibit C.

## ARTICLE VII: INSURANCE.

The Parties shall cause the Company to obtain an extensive title insurance on the Property and an extensive 'umbrella' liability insurance policy to reasonably cover, at a minimum and without limitation, all events referred to in the Construction/Conversion Schedule.

## ARTICLE VIII: ASSIGNMENT.

The rights of a Member to sell or assign any and all of its Membership Interests shall be in accordance with the restrictions set forth in the Operating Agreement.

## ARTICLE IX: REPRESENTATIONS AND WARRANTIES.

9.1     Representations and Warranties, Generally. Each of the members of the Yerushalmi Group hereby makes the following representations and warranties to Harlem Suites, each of which shall be deemed material.  Harlem Suites, in executing, delivering, and consummating this Agreement, has relied and will rely upon the correctness and completeness of each of such representations and warranties.

9.2     Power and Authority.  The Company, and Yerushalmi Group and each of its members, have full power and authority to enter into this Agreement and to carry out its obligations.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by the Company and no other proceedings, corporate or otherwise, on the part of the Company are necessary in order to authorize the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby.  This Agreement constitutes the valid and binding obligation of each of the members of the Yerushalmi Group and is enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, moratorium or similar laws relating to the enforcement of creditors' rights generally and the application of general principles of equity.

9.3     Valid Corporate Formation; Existence; Good Standing.  The Company, a limited liability company formed on January 16, 2003, was duly organized, has validly existed, and is in good standing under the laws of the State of New York, which is the only jurisdiction in which the Company is required to qualify in order to own the Property and to carry on its business, and has the

6



HS 45

power to carry on its business as now being conducted and to own its asset(s). The authorized Membership Interests of the Company, all of which are issued and outstanding, and a list of all record and beneficial owners of such Membership Interests, is included in Exhibit A of the Operating Agreement of the Company dated as of March 4, 2005, which fully replaced the operating agreement of January 16, 2003. A copy of the operating agreements of the Company is attached as <u>Schedule 9.3</u>. Except as set forth on such Schedule, since the date the Company was formed, no other Person has merged with or into the Company. All of the outstanding Membership Interests have been duly authorized and validly issued and are fully paid, nonassessable and free of any preemptive or similar rights. The Company's formation documents, and current and binding operating agreement with exhibits, are attached hereto as <u>Schedule 9.3</u>

9.4   <u>Property.</u>   <u>Schedule 9.4</u> includes all evidence of ownership by the Company of real property, and all options held by the Company to acquire any real property, including without limitation the Property.

9.5   <u>Mortgages, Encumbrances, etc.</u>   Except as expressly stated in <u>Schedule 9.4</u> and apart from the two (2) mortgage notes and accompanying mortgage documents included as <u>Schedule 9.5</u>, the Company owns outright and has good, valid, and marketable fee simple title in and to all of the Property, free and clear of all liens, claims, mortgages, pledges, security interests, charges, or encumbrances of any kind or nature whatsoever or adverse claims and other matters affecting the Company's title to or possession of such Property, including without limitation, all encroachments, boundary disputes, covenants, restrictions, options, resolutory conditions, easements, servitudes, rights of way, leases, and title objections or defects, excepting only such easements, servitudes, restrictions and covenants which constitute any state of facts shown on the survey provided with the updated recent title report obtained by the Company; provided, however, that such state of facts will not: (i) interfere with or impair Harlem Suites' intended use of the Property; and/or (ii) reduce the value of the Property. The members of the Yerushalmi Group hereby warrant and represent that no later than the date of the WaMu Closing, both said mortgages shall be paid off fully.

9.6   <u>Appraisals.</u> Other than (i) an appraisal report (unsigned) dated March 6, 2003 valuing the Property at $5.5 million as of January 18, 2003; (ii) an appraisal letter (unsigned) dated October 13, 2004 valuing the Property at $6.3 million as of October 1, 2004; and (iii) an <u>appraisal dated January 10, 2005</u> prepared by Miller Cicero, LLC for WaMu, provided by David Yerushalmi, included as <u>Schedule 9.6</u>, no other appraisals of the Property have been , previously obtained by the Company or by Yerushalmi Group on behalf of the Company in respect of the Property.

9.7   <u>Title Documentation.</u>   <u>Schedule 9.7</u> includes (i) the valid and existing title insurance of the Property (the 'Title Insurance Policy"); (ii) a title report dated January 5, 2004; and (iii) an updated title report dated recently received by the Company. The Company has no other title insurance policies, title report, title search, or any part thereof, previously obtained by the Company or by Yerushalmi Group on behalf of the Company in respect of the Property.

9.8   <u>Property and other Insurance.</u> <u>Schedule 9.8</u> includes all policies of property, general liability, umbrella, boiler, machinery, fire, and other forms of insurance held by the Company as of the date hereof in respect of the Property. All such policies are valid, outstanding and

HS 46

enforceable policies, as to which premiums have been paid currently.

9.9    Utilities. After reasonable inquiry conducted, neither the Company nor any member of the Yerushalmi Group are aware of, or should have been aware of, any information or facts that would reasonably lead to the conclusion that the following representations may be inaccurate or incomplete. The water, electric, gas and sewer utility services and any septic tank and storm drainage facilities currently available to the Property are adequate for the present use thereof by the Company. The Company has obtained all the authorizations and rights-of-way, including proof of dedication, which are necessary to ensure vehicular and pedestrian ingress and egress to and from the Property. There are no restrictions on the entrance to or exit from the Property to adjacent public streets, and/or conditions which will result in the termination of the present owners from the Property due to existing highways and roads.

9.10    Property Leases. Schedule 9.10 includes all leases and subleases of any of the Property to third-party(s) by the Company or by Yerushalmi Group in connection with the Company (collectively, the "Property Leases"). Each Property Lease is in full force and effect and has not been assigned, modified, supplemented or amended. Neither Yerushalmi Group, the Company, nor any and all lessees thereunder is in default under any of the Property Leases, including without limitation, in respect of non-payment of any rent, and no circumstances or state of facts presently exists which, with the giving of notice or passage of time, or both, would permit termination of any such Property Lease. No event or circumstance has occurred which could reasonably be expected to result in material liability for restoration of any premises under any such Property Lease (the "Leased Premises"). Except as set forth in Schedule 9.10, the Company's ownership of such Leased Premises is not subject to or subordinate to any security interest, lien or mortgage and all security deposits reflected in the Property Leases are currently held by the Company. All uses of the Premises conform to all laws relating to building and zoning regulation and to the provisions of the applicable Property Leases.

9.11    Zoning and other Property Laws. After reasonable inquiry conducted, neither the Company nor any member of the Yerushalmi Group are aware of, or should have been aware of, any information or facts that would reasonably lead to the conclusion that the following representations may be inaccurate or incomplete. The Property and the present uses thereof fully comply with all applicable building, zoning and other Laws (and any applicable certificates of occupancy) of all governmental authorities having jurisdiction over the Property, all as described on Schedule 9.11. Yerushalmi Group and/or the Company have received no notices, oral or written, from any such governmental authority (including any deficiency notices, work orders and other similar requirements), and has no reason to believe, after reasonable inquiry, that the Property or any improvements erected or situated thereon, or the uses conducted thereon or therein, violate any such laws. In addition, neither Yerushalmi Group nor the Company has received any notices, oral or written, and has any reason to believe, after reasonable inquiry, that any governmental body having the power of eminent domain over the Property has commenced or intends to exercise such power of eminent domain or a similar power with respect to all or any part of the Property.

9.12    No Material Defects. After reasonable inquiry conducted, neither the Company nor any member of the Yerushalmi Group are aware of, or should have been aware of, any information or facts that would reasonably lead to the conclusion that the following representations may be

8

HS 47

inaccurate or incomplete.    Except for the defects mentioned in the December 11, 2004 Engineering Report attached hereto as Schedule 9.12 and the defective elevators in the Property, the Property and each of its components are in good condition and are structurally sound with no known material defects.    Except for as reflected on the Engineer Report, all mechanical, electrical, plumbing, heating and other systems located therein are in good operating condition, subject to ordinary wear and tear, and no condition exists requiring material repairs, alterations or corrections.

9.13    Financial Statements.    Schedule 9.13 contains a true and complete copy of the following: (i) the unaudited balance sheet and income tax statement of the Company as of and for the tax year 2003 (which currently misstates work in progress that is expected to be recast as a fixed asset); (ii) the unaudited balance sheet and related income statement of the Company as of and for tax year 2004; and (iii) all bank account(s)  statements and bank reconciliation(s) from formation of the Company until the date of the WaMu Closing (collectively the "Financial Statements").  The Financial Statements have been prepared by Yerushalmi Group and the Company on a consistent basis throughout the periods covered thereby and fairly present in all material respects, on a pro forma basis, the combined financial condition and results of operations of the Company, in each case, as of the respective dates thereof and for the respective periods covered thereby.

9.14    Taxes.  The representations in this Section 9.14 relate to the period ending on the date hereof. The Company has filed or caused to be filed, within the times and in the manner prescribed by law, all of the federal, state, local and foreign tax returns, information returns and tax reports (including any related or supporting information) which are required to be filed by the Company with all of the appropriate domestic, foreign, provincial, state, municipal and/or other local governments, or any subdivision or agency thereof.  Such returns and reports accurately reflect all of the Company's liability for taxes for the periods covered thereby, are true, correct and complete in all material respects, and all amounts shown as owing thereon have been paid.  All federal, state, local and foreign income, gross receipts, profits, franchise, sales, goods and services, use, occupancy, excise, and custom duties and other taxes and assessments (including interest and penalties) (collectively, the "Taxes") payable by, or due from, the Company have been fully paid or adequately disclosed and fully provided for in the Company's books and financial statements.  All Taxes that are or were required by law to be withheld or collected by the Company have been duly withheld or collected and, to the extent required, have been paid to the proper taxing authority.  There are no outstanding agreements or waivers extending the statutory period of limitation applicable to any such tax return of the Company.  The Company is not a "foreign person" within the summary of Section 1445(F)(3) of the Tax Code.

9.15    Compliance with Laws.    After reasonable inquiry conducted, neither the Company nor any member of the Yerushalmi Group are aware of, or should have been aware of, any information or facts that would reasonably lead to the conclusion that the following representations may be inaccurate or incomplete. The operation of the Company and the Property has been conducted in material compliance with all applicable laws, ordinances, rules, regulations and other requirements of all national governmental authorities, and of all federal, provincial, state, municipal and other political subdivisions and commissions, bureaus, agencies and instrumentalities thereof, having jurisdiction over the Company and Property, respectively.

9

HS 48

9.16   Environmental Protection; Storage; Hazardous Materials, Etc. After reasonable inquiry conducted, neither the Company nor any member of the Yerushalmi Group are aware of, or should have been aware of, any information or facts that would reasonably lead to the conclusion that the following representations may be inaccurate or incomplete. Other than the information contained in Schedule 9.16, (i) there are no underground storage tanks on the Property; (ii) there are no polychlorinated biphenyls ("PCBs") used or stored on the Property; (iii) there are no off-site locations where the Company has stored, disposed of or arranged for the disposition of any hazardous materials; (iv) there have been no discharges or spills of any contaminants, pollutants, chemicals, petroleum or petroleum products, or industrial, toxic or hazardous substances or wastes that has or have impacted or affected the Property; and (v) no waste has been stored or disposed of on, in or under the Property in violation of any environmental law. The Company, in connection with the Property, has obtained all material permits, licenses and other authorizations which are required under current federal, state, local and foreign laws and guidelines relating to pollution or protection of the environment, including laws relating to emissions, discharges, releases or threatened releases of pollutants, contaminants, chemicals, or industrial, toxic or hazardous substances or wastes into the environment (including without limitation, ambient air, surface water, ground water or land) or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of pollutants, contaminants, chemicals, petroleum or petroleum products, or industrial, toxic or hazardous substances or wastes (collectively, the "Environmental Laws"). The Company is in material compliance with all of the terms and conditions of all such material permits, licenses and authorizations, and is also in material compliance with all other limitations, restrictions, conditions, standards, prohibitions, requirements, obligations, schedules and timetables set forth in any such Environmental Laws or in any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder. There is no civil, criminal or administrative action, suit, demand, claim, hearing, notice or demand letter, notice of violation, investigation or proceeding pending, or to the knowledge of Yerushalmi Group or the constructive knowledge of the Company after reasonable inquiry, threatened, against the Company, Yerushalmi Group, or the Property, relating in any manner to any such Environmental Laws or any regulation, code, plan, order, decree, judgment, injunction, notice or demand letter issued, entered, promulgated or approved thereunder.

9.17   Listed Agreements.   Except for the memoranda and agreements attached hereto as Schedule 9.17 (the "Listed Agreements"), there are no liabilities or obligations of the Company and/or of Yerushalmi Group in connection with the Company, to any vendors, suppliers, and/or service providers in respect of the Property, and the Company and/or Yerushalmi Group is not a party to or bound by any written or oral contract agreement, order (including any purchase or sale orders), other contractual commitment, understanding or obligation relating to the Company or to the Property. A true and correct copy of each of the Listed Agreements has heretofore been delivered by Yerushalmi Group to Harlem Suites. Each such Listed Agreement is in full force and effect and the Company has performed all obligations required to be performed by it to date under each Listed Agreement, is not in default under any of the Listed Agreements and has received no notice of any default or alleged default thereunder which has not heretofore been cured or which notice has not heretofore been withdrawn. Yerushalmi Group, after reasonable inquiry, does not know (and the Company does not constructively know) of any default under any of the Listed Agreements by any other party thereto or by any other person, firm or corporation bound

10



HS 49

thereunder, or of any event or circumstance which, with the giving of notice or passage of time, or both, would permit any party thereto to terminate any such Listed Agreement. Neither the Company nor Yerushalmi Group is presently renegotiating any of the Listed Agreements. Each and every (i) lease currently in effect and (ii) lessee currently in possession, whether or not by holdover, oral agreement, or otherwise, possesses each and every license, permit, clearance, etc. and is in full compliance with all law and/or regulations of any governing body with respect to the subject matter of the leasehold (i.e., antenna and equipment; self-storage, etc.). The Yerushalmi Group and the Company are in receipt of a written binding commitment from Top Security Self-Storage, LLC (the "Self-Storage Tenant") expressly stating the consent of, or otherwise drafted to effectuate, the Self-Storage Tenant permanently evacuating, and emptying, any and all of the premises occupied by the Self-Storage Tenant under the lease, holdover, and/or otherwise, by no later than April 15, 2005, with no resultant claims or related conditions whatsoever. Furthermore, the Company and each and every member of the Yerushalmi Group hereby acknowledge and agree that the Nextel Communications lease with Norman Realty, Inc., dated 7/30/01, with respect to premises leased in the Property, provides for a $6,000 (six thousand dollars) security deposit which may not have been collected by the Company from the previous landlord, in addition to an $800 (eight hundred dollars) security deposits from Haks Engineering. The Yerushalmi Group and the Company shall indemnify and save Harlem Suites harmless of any claim, demand, omission, or offset, including reasonable attorneys' fees, made against the Company and/or Harlem Suites pursuant to such lease and/or any and all of its terms, including but not limited to the payment, lack of payment, application towards rent, or the partial or full return of such security deposit prior to closing.

9.18    Machinery and Equipment.    Except for the items listed in Schedule 9.18, there are no machinery, equipment, furniture, vehicles and/or other tangible assets constituting part of the Company and/or Property.

9.19    Permits.    A copy of all permits, licenses, orders, franchises and approvals (collectively, the "Permits") from any and all federal, state, local and foreign governmental regulatory bodies held by the Company relating to the Property and any other conduct of the Company are attached hereto as Schedule 9.19. The Company has all Permits of all federal, provincial, state, local and foreign governmental or regulatory bodies, respectively, required of it to carry on its business as presently conducted. To the knowledge of Yerushalmi Group, or to the constructive knowledge of the Company, after reasonable inquiry, no suspension or cancellation of any Permit is threatened. Yerushalmi Group and the Company are each in compliance with all requirements, standards and procedures of the federal, provincial, state, local and foreign governmental authorities which would issue such Permits.

9.20    Employees.    There are no person(s) actively employed by the Company. In addition, Yerushalmi Group and/or the Company are not liable for any arrears of wages, vacation pay or other compensation to any employee or independent contractor in respect of the Company. There are no pension and welfare benefit plans maintained by the Company or to which the Company makes (or is required to make) employer contributions or otherwise has any obligations with respect thereto in respect of the employees and/or former employees, if any, of the Company, whether single employer or multi-employer, and/or bonus, deferred compensation, profit sharing, retirement, option(s), membership interest purchase, and hospitalization insurance plans or other plans or arrangements of the Company providing employee benefits.

HS 50

9.21    Litigation.    There are no actions, suits, proceedings or governmental investigations relating to or involving the Company and/or Yerushalmi Group in respect of the Company and/or any part of and/or the entire Property, by or before any court, arbitrator or governmental or other regulatory agency or commission either pending or, to the knowledge and/or constructive knowledge of Yerushalmi Group and/or the Company, after reasonable inquiry, threatened, or any outstanding order, injunction, judgment, writ, award or decree against the Company, Yerushalmi Group, or the Property. The consummation of the transactions contemplated by this Agreement will not give rise to any liability of Yerushalmi Group and/or the Company for severance pay or termination pay solely by reason of such transactions.

9.22    No Breach.    Neither the execution and delivery of this Agreement nor compliance by any and all member(s) of the Yerushalmi Group and/or by the Company with any of the provisions hereof nor consummation of the transactions contemplated hereby, will (i) violate or conflict with any provision of the Articles of Organization and/or operating agreement(s) of the Company; (ii) violate or, alone or with notice or the passage of time, result in the material breach or termination of, or otherwise give any contracting party the right to terminate, or declare a default under, the terms of any agreement, lease, note, mortgage, instrument or other document or undertaking, oral or written, relating to the Property or to the Company to which any or all of the members of Yerushalmi Group is/are a party or by which it may be bound (except for such violations, conflicts, breaches or defaults as to which required waivers or consents by other parties have been, or will, prior to the execution hereof, be obtained); (iii) result in the creation of any lien, security interest, charge or encumbrance upon the Property; (iv) violate any judgment, order, injunction, decree or award against, or binding upon Yerushalmi Group or the Property or the Company; or (v) violate any law or regulation of any jurisdiction relating to Yerushalmi Group, the Property, or the Company.

9.23    Brokers.    All negotiations relative to this Agreement and the transactions contemplated hereby have been carried on directly with Harlem Suites by Yerushalmi Group without the intervention of any broker, finder, investment banker or other third-party. Neither the Yerushalmi Group nor the Company has engaged, consented to, or authorized any broker, finder, investment banker or other third-party to act on its behalf, directly or indirectly, as a broker or finder in connection with the transactions contemplated by this Agreement. Each member of the Yerushalmi Group hereby agrees to indemnify Harlem Suites, and to hold Harlem Suites harmless, from and against any claim for brokerage or similar commission or other compensation which may be made against Harlem Suites by any third-party in connection with any of the transactions contemplated hereby, which claim shall be based upon any action by or on behalf of the Company and/or Yerushalmi Group and/or any of its members.

9.24    Labor Relations.    (i) The Company is in material compliance with all applicable laws relating to employment and employment practices, terms and conditions of employment and wages and hours, and is not engaged in any unfair labor practice; (ii) there is no unfair labor practice charge or complaint against Yerushalmi Group or against the Company pending, or to the knowledge of Yerushalmi Group and/or the constructive knowledge of the Company, after reasonable inquiry, threatened before any federal, state and/or municipal board, tribunal or other body having jurisdiction (a "Labor Tribunal"); (iii) there is no labor strike, dispute, slowdown or

12



HS 51

stoppage pending or threatened against or affecting the Company; (iv) there is no representation, claim or petition pending before any Labor Tribunal and no question relating to representation exists with respect to employees or former employees of the Company; and (v) there is no collective bargaining agreement which is binding upon the Company.

9.25    Claims, Material Information. There are no claims, pending or threatened relating to or involving the Company and/or Yerushalmi Group in respect of the Company and/or any part of and/or the entire Property. No material documents and/or information relating to Company or the Property exist which is not referred to and/or included in this Agreement and the Schedules attached hereto. The Yerushalmi Group shall indemnify (i) the Company against any debt, claim, suit and/or proceeding, including without limitation reasonable attorneys' fees, commenced or reasonably antipicated against the Company and/or Harlem Suites as of the date this Agreement is executed by Harlem Suites; and (ii) Harlem Suites against any and all claims, debt, claim, suit and/or proceeding, commenced or reasonably anticipated against Harlem Suites whether or not as sole defendant, co-defendant, and/or in any other capacity, based on any act or omission of the Company and/or any of its Member(s) which occurred or originated prior to the date Harlem Suites executes this Agreement.

9.26    Statement of Net Worth.  The following is an accurate, truthful, and complete statement of each of the listed Parties' individual and corporate net worth, as fully more described and as accurately listed on Schedule 9.26.

| Individual or Entity | Net Worth (US$) |
| --- | --- |
| David Yerushalmi | $8,000,000 |
| Joseph Gopin | $10,000,000 |
| Jonathan Ilan Ofir | $8,000,000 |
| Jonathan Rigby | $1,000,000 |
| 231 Norman Avenue, LLC | $525,000 |

9.27    Power and Authority of Harlem Suites. Harlem Suites and each of its members, have full power and authority to enter into this Agreement and all other agreements and documents related to this transaction and to carry out its obligations. This Agreement constitutes the valid and binding obligation of Harlem Suites and is enforceable in accordance with its terms, subject to applicable bankruptcy, reorganization, moratorium or similar laws relating to the enforcement of creditors' rights generally and the application of general principles of equity.

9.28    Valid Corporate Formation: Existence; Good Standing of Harlem Suites.  Harlem Suites, a limited liability company was duly organized, has validly existed, and is in good standing under the laws of the State of New York, which is the only jurisdiction in which the Company is required to qualify in order to own the Property and to carry on its business, and has the power to carry on its business as now being conducted and to own its asset(s).
9.29

## ARTICLE X: MISCELLANEOUS PROVISIONS

10.1    Modification. Conflicts. The Parties hereby acknowledge and agree that any modification

13

HS 52

of this Agreement and/or any part hereof shall require the written unanimous consent of the Members and shall not require the consent of all of the remaining Parties. To the extent that there is a conflict between this Agreement and any other agreement, this Agreement shall govern and control as to the matter at issue.

10.2    Good Faith Cooperation.    The Members acknowledge and agree that obtaining a successful relationship which would be beneficial to the Company shall require their full and mutual good faith cooperation. The Members undertake to act in good faith and make their best efforts to fully cooperate with the other Party in promoting the transactions contemplated herein. The Parties hereby agree to pass resolutions and to sign any appropriate document necessary to implement the provisions of this Agreement.

10.3    Confidentiality. The Parties agree to maintain in confidence all confidential information with regard to the operation of the Company, and shall prevent such information from becoming known to anyone other than necessary employees or agents, if any, of the Company. Notwithstanding the immediately-preceding sentence, the Parties may use the existence of this Agreement for bona-fide marketing and sales purposes, including without limitation, promotion with respect to future sales contemplated hereto.

10.4    No Partnership Intended for Non-Tax Purposes. The Members have formed the Company under the LLC Law and expressly do not intend hereby to form a partnership or limited partnership. The Members do not intend to be partners to one another or partners as to any third party. To the extent that any Member, represents to another person in any manner whatsoever that any other Member is a partner or that the Company is a partnership, the Member making such wrongful representation shall be liable to any other Member who incurs personal liability, and to the Company if it incurs corporate liability, by reason of such wrongful representation.

10.5    Competing Business; Related Party Transactions. The Parties shall refrain from being actively or non-actively involved in any real-estate transaction in a 1-mile radius from the Property without first obtaining the written consent of all of the Members. Except as otherwise expressly provided in this Agreement or the LLC Law, the Members and their shareholders, directors, officers, employees, partners, agents, family members or affiliates, shall not be prohibited or restricted from investing in or conducting without disclosure, either directly or indirectly, businesses involving the purchase and sale of real estate assets in any other place, including, but not limited to, the sale, ownership, and/or operation of real estate and/or businesses identical to, similar to those to be held by the Company or held by the Company. Any such investment in or conduct of any such businesses by any such person or entity shall not give rise to any claim for an accounting or for damages by any or all of the Members or the Company. Further, the Company shall have no such claim against such person or any choate or inchoate right to claim any interest of the offending Member in such business(s) or the profits therefrom.

10.6    Non-Recruitment, Non-Solicitation, Non-Interference For a period commencing on the date the Company is formed, continuing with the term of this Agreement, and ending one (1) year after the termination of this Agreement with respect to one or more of the Parties, no Party shall, or assist anyone else to (i) seek to persuade any employee or consultant of the Company to discontinue

14





HS 53

employment with or work on behalf of the Company; (ii) seek to persuade any independent contractor, supplier, customer or service provider to discontinue his/her relationship with the Company or refrain from entrusting additional business to, or doing additional business with, the Company; or (iii) affect to the detriment of the Company or any of its affiliates any relationship of the Company, its affiliates, and/or of its directors, officers, employees agents and consultants, with any customer, employee, agent or consultant of the Company or its affiliates.

10.7    No Disparagement    Each Party agrees to refrain from, publicly or in the media, (i) disparaging the Company and/or its Members and/or business, and (ii) taking any action designed to harm the public perception of the Company and/or its Members and/or business, except as may be required by law. The Company may bring appropriate enforcement, injunctive, and other proceedings against any Party who breaches this provision.

10.8    Notices.    All Notices, demands or requests provided for or permitted to be given pursuant to this Agreement must be in writing.  All notices, demands and requests to be sent to any Member or Members pursuant to this Agreement shall be deemed to have been properly given or served if addressed to such person at the address as it appears on the Company records and personally delivered, deposited for next day delivery by an overnight courier service, deposited in the United States mail, prepaid and registered or certified with return receipt requested, or transmitted via telecopier or other similar device to the attention of such person with receipt acknowledged.  Any notice to the Company shall be addressed to the Company's principal place of business. Notice shall be deemed to have been given as of the earlier of: (a) the date of actual receipt or refusal of such notice, or (b) the date of the confirmed transmission of any notice by facsimile. The Parties shall have the right, at any time during the term of this Agreement, to change their respective addresses by delivering to the other Parties written notice of such change.

10.9    Governing Law.    This Agreement shall be interpreted, construed and enforced in accordance with the laws of the State of New York., and the applicable court in the City of New York, Borough of Manhattan shall have sole jurisdiction in respect to any dispute arising from or relating to the application, validity or interpretation of this Agreement or the operating of the Company.  Notwithstanding the immediately-preceding sentence, Harlem Suites shall have the right, in its sole and absolute discretion, to file, and seek and obtain execution and enforcement of, any and all of the Guaranties attached hereto as Exhibit F in the State of Israel, as stated therein.

10.10   Dispute Resolution.    Upon the occurrence of a dispute between the Parties, including disputes between the Members and the Company arising under or with respect to the operations of the Company and/or relating to this Agreement, its validity and interpretation of its provisions, such dispute shall be submitted to binding arbitration in New York under the rules of the American Arbitration Association. The arbitration award shall be final and binding upon the Parties and enforceable in any court of competent jurisdiction. Nothing herein shall be construed to prevent a court of competent jurisdiction from granting provisional equitable relief. In any action or proceeding to enforce rights under this Agreement, the prevailing party will be entitled to recover costs and reasonable attorney's fees from the other party.

10.11   Waiver. No consent or waiver, express or implied, by any Party to or for the breach or

15

HS 54

default by any other Party in the performance by such other Party of his or its obligations under this Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other Party of the same or any other obligations of such other Party under this Agreement. Failure on the part of any Party to complain of any act or failure to act of any of the other Party or to declare any of the other Parties in default, regardless of how long such failure continues, shall not constitute a waiver by such Party of his or its rights hereunder.

10.12  Construction. The headings and subheadings of this Agreement have been inserted for convenience only and are to be ignored in any construction of the provisions hereof. All references to sections of this Agreement shall be deemed to refer as well to all subsections which form a part of such section. The singular shall include the plural and the plural shall not exclude the singular unless the context otherwise indicates or requires.

10.13  Benefits of Agreement. Subject to the restrictions on transferability set forth in this Agreement, this Agreement shall inure to the benefit of and be binding upon the undersigned Parties and their respective legal representatives, successors and assigns.

10.14  Entire Agreement; Amendments; Severability; General. This Agreement, including all exhibits and schedules hereto, as amended from time to time in accordance with the terms of this Agreement, contains the entire agreement between the Parties relative to the subject matters hereof. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby, and the intent of this Agreement shall be enforced to the greatest extent permitted by law.

10.15  Counterparts. This Agreement may be executed in any number of counterparts and by different Parties in separate counterparts, each of which when so executed shall be deemed an original, but all of such counterparts together shall constitute but one and the same instrument.

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be duly adopted as of the day and year first above written and do hereby assume and agree to be bound by and to perform all of the terms and provisions set forth in this Agreement.

231 Norman Avenue Property
Development, LLC                          David Yerushalmi

By:
Print Name: David
Title: Manager                           Joseph Gopin
Date: 5/6/05

16

HS 55

Harlem Suites, LLC

By:

Print Name: AMIR YERUSHALMI

Title:

Date: 3/6/05

Jonathan Ilan Ophir  O AIR

Jonathan Rigby

231 Norman Avenue, LLC

By:

Print Name: David Gerstenhaber

Title: manager

Date: 3/6/05

File: 1400172(m)
Z:\Vision\Norman\Construction K\Construction-K-Norman-v17-OH.doc

17

HS 56

# PEM combined assets

## DY, JIO, JR, JG - Combined business assets

| | Market value | Debt | Net Equity | |
|---|---|---|---|---|
| **USA** | | | | |
| 400 East Shore Rd (50%) | 10,000,000 | - | 10,000,000 | |
| 13 homes in Buffalo, NY | 780,000 | 63,000 | 717,000 | |
| 231 Norman Ave, Brooklyn | 6,246,969 | 4,300,000 | 1,946,969 | purchase 6,038,000 + construction related 189,000 |
| 75 Carnegie E. Orange | 425,000 | 215,000 | 210,000 | |
| Stocks - DCI | 1,600,000 | - | 1,600,000 | 2 public companies - Israeli & USA |
| **Cash & Loans receivable** | | | | |
| Cash on hand & in bank | | | | |
| Note receivable - Jay Solomont | 750,000 | - | 750,000 | |
| Loans - Jacob Gershoni | 800,000 | - | 800,000 | |
| **Israel** | 350,000 | - | 350,000 | loan with an option |
| ZMH | | | | |
| Chavat Hayaen - | 6,000,000 | - | 6,000,000 | Israeli RE company, valuation at last sale |
| Apartment - Natanya | 1,500,000 | - | 1,500,000 | 18 dunams in Eilat for resort development, 350 units, actual investment |
| | 140,000 | 70,000 | 70,000 | |
| **Subtotal Business assets** | 28,591,969 | 4,648,000 | 23,943,969 | |

## DY, JIO, JR, JG - Personal property

| | Market value | Debt | Net Equity | |
|---|---|---|---|---|
| 3 condos New York, NY | 2,050,000 | 657,000 | 1,393,000 | |
| Home in Great Neck, NY | 750,000 | 420,000 | 330,000 | |
| Cohav Hayarden | 300,000 | 230,000 | 70,000 | |
| 3 family brownstone, New York | 610,000 | 470,000 | 140,000 | |
| Interest in family business - Australia | 500,000 | - | 500,000 | |
| Misc personal property | 50,000 | - | 50,000 | |
| House - Herzlia Pituach | 1,100,000 | 320,000 | 780,000 | |
| **Subtotal Personal property** | 5,360,000 | 2,097,000 | 3,263,000 | |
| **TOTAL PEM** | 33,951,969 | 6,745,000 | 27,206,969 | |

## PEM combined assets

| DY | Market value | Debt | Net Equity |
|---|---|---|---|
| ZMH | 6,000,000 | - | 6,000,000 |
| Chavat Hayaen | 1,000,000 | - | 1,000,000 |
| Loans - Jay Solomont | 800,000 | - | 800,000 |
| Loans - Gershoni | 200,000 | - | 200,000 |
| Cohav Hayaerden | 300,000 | 230,000 | 70,000 |
| 75 Carnegie E. Orange | 425,000 | 215,000 | 210,000 |
| Total DY | 8,725,000 | 445,000 | 8,280,000 |
| | | | - |
| JG | | | - |
| Cash on hand & in bank | 750,000 | - | 750,000 |
| Savings accounts | 800,000 | - | 800,000 |
| Notes receivable | 500,000 | - | 500,000 |
| Stocks - DCI Ltd | 1,600,000 | - | 1,600,000 |
| Stocks & bonds - Mics | 600,000 | - | 600,000 |
| 3 family brownstone | 610,000 | 470,000 | 140,000 |
| 400 East Shore Rd (50%) | 10,000,000 | - | 10,000,000 |
| Interest in family business - Australia | 500,000 | - | 500,000 |
| Misc personal property | 50,000 | - | 50,000 |
| Total JG | 15,410,000 | 470,000 | 14,940,000 |
| | | | |
| JR | | | |
| House - Herzlia Pituach | 1,100,000 | 320,000 | 780,000 |
| Apartment - Natanya | 140,000 | 70,000 | 70,000 |
| 13 homes in NYS | 780,000 | 63,000 | 717,000 |
| 231 Norman Ave | 7,000,000 | 4,300,000 | 2,700,000 |
| Condo NYC | 750,000 | 357,000 | 393,000 |
| Total JR | 9,770,000 | 5,110,000 | 4,660,000 |
| | | | |
| TOTAL PEM | 33,905,000 | 6,025,000 | 27,880,000 |

**Exhibit 2**
**(Harlem Suites Final Judgment)**

CFN # 109928521, OR BK 47786  Page 476, Page  1 of 7, Recorded 03/16/2011 at
09:11 AM, Broward County Commission,   Deputy Clerk 1067

The People of the State of New York:

BY THE GRACE OF GOD FREE AND INDEPENDENT

*To all to whom these presents shall come or may concern, GREETING:*

**Know Ye,** That we having examined the records and files in the office of
the Clerk of the County of New York and Clerk of the Supreme Court of said State
for said County, do find a certain *Judgment*

This is to certify that on 03/16/2011 , notice of this
recording was sent to the Debtor(s) at the addresses
given in the affidavit recorded concurrently herewith.

County Administrator

By _____ Deputy

there remaining, in the words and figures following, to wit:

THIS IS NOT

OFFICIAL COPY

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HARLEM SUITES, LLC,

Index No. 603179-08

**MONEY JUDGMENT**

Plaintiff,

– against –

231 NORMAN AVENUE, LLC, DAVID
YERUSHALMI, JOSEPH GOPIN, JONATHAN
RIGBI, and JONATHAN ILAN OFIR,

Defendants.

Plaintiff Harlem Suites, LLC ("Harlem Suites"), having cross-moved this Court by notice
of cross motion dated January 4, 2010, together with the Affidavits of Amir Yerushalmi dated
December 28, 2009 and April 7, 2010, and the exhibits attached thereto, for an Order pursuant to
CPLR § 3212 awarding Harlem Suites summary judgment; and with opposition by defendants;
and the motion having duly come on to be heard before the Honorable Joan A. Madden, a Justice
of this Court, and the Court having rendered a written decision on the motion dated July 13, 2010
that was entered with the Clerk of Court on July 16, 2010, granting the motion for summary
judgment and directing that judgment be entered in favor of Harlem Suites against Defendants in
the amount of $1,525,759.00 plus interest at the rate of 10% from September 5, 2009 to the date
of entry of the judgment and at the legal rate of 10% thereafter.

NOW, upon the motion of Cole, Schotz, Meisel, Forman & Leonard, P.A., attorneys for
plaintiff Harlem Suites, it is

ADJUDGED, that the plaintiff, Harlem Suites, LLC, with a principal place of business at
350 Fifth Avenue, New York, NY, 10118, do recover of defendants 231 Norman Avenue, LLC,

36968/0001-6894480v1

CFN # 109928521, OR BK  47786  PG  478,  Page  3 of 7

11222-1563

DCI, USA, Inc., David Yerushalmi, Joseph Gopin, Jonathan Rigbi, and Jonathan Ilan Ofir, with a principle place of business at 231 Norman Avenue, Brooklyn, NY, the principal sum of One Million, Five Hundred and Twenty Five Thousand, Seven Hundred and Fifty Nine Dollars ($1,525,759.00), with interest thereon from **September 5, 2009**, at a rate of 10% per annum, in the sum of Seventy Two Thousand Seventy + 50/100 ($ 72,070 00 ) Dollars, plus other costs and disbursements as taxed in the sum of Four Hundred Fifty Five ($ 455 00 ) Dollars, making in all the sum of One Million Five Hundred Ninety Eight Thousand Two Hundred Eighty Four + 50/100 ($ 1,598,284 50 ) Dollars, and that plaintiff have execution therefor.

Dated: August 5, 2010

_Clerk of Court_

FILED

AUG - 5 2010

COUNTY CLERK'S OFFICE
NEW YORK

STATE OF NEW YORK, COUNTY OF ...
SS. I, NORMAN GOODMAN, COUNTY CLERK AND
CLERK OF THE SUPREME COURT ...
COUNTY, ...

2011 FEB 25  P 3: ...    05 10

THAT I HAVE COMPARED THE ...
WITH THE ORIGINAL FILED IN ...

8/5/2010

NOVEM...

2

CFN # 109928521, OR BK  47786  PG  479,  Page  4 of 7



CFN # 109928521, OR BK 47786 PG 480, Page 5 of 7

STATE OF NEW YORK, COUNTY OF _N Y_    ss.    ATTORNEY'S AFFIRMATION

The undersigned, an attorney admitted to practice in the courts of this state, affirms: that I am

the attorney(s) of record for the _Plaintiff_ in the above entitled action; that foregoing disbursements have been or will necessarily be made or incurred in this action and are reasonable in amount and that each of the persons named as witnesses attended as such witness on the trial, hearing or examination before trial herein the number of days set opposite their names; that each of said persons resided the number of miles set opposite their names from the place of said trial, hearing or examination; and each of said persons, as such witness as aforesaid, necessarily traveled the number of miles so set opposite their names in traveling to, and the same distance in returning from, the same place of trial, hearing or examination; and that copies of documents or papers as charged herein were actually and necessarily obtained for use.

The undersigned affirms that the foregoing statements are true, under the penalties of perjury.

Dated:

FILED

AUG - 5 2010

COUNTY CLERKS OFFICE
NEW YORK

The name signed must be printed beneath

_Jed Weiss_

---

Index No. 603175/08

SUPREME COURT
COUNTY OF New York

Hudson Suites LLC

Plaintiff(s)

against

261 Madison Ave. LLC et al.

Defendant(s)

## Bill of Costs
and Notice of Taxation

Please Take Notice that the within is a true copy of the terms of costs and disbursements in the within action taxed* _and that the same will be taxed*_

by the Clerk of

Court, at his/her office in the courthouse thereof on at

of that day—and the amount inserted in the judgment

N.

Yours, etc.

Attorney(s) for

To

Attorney(s) for

Service of the within bill of costs and notice of taxation is hereby admitted on

Attorney(s) for

---

State of New York, County of    ss.:

being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at

That on

deponent served the within bill of costs and notice of taxation on

attorney(s) for

herein, at his/her office at

during his/her absence from said office

strike out either (a) or (b)

(a) by then and there leaving a true copy of the same with

his/her clerk, partner, person having charge of said office.

(b) and said office being closed, by depositing a true copy of same, enclosed in a sealed wrapper directed to said attorney(s), in the office letter drop or box.

Sworn to before me on

---

State of New York, County of    ss.:

being duly sworn, deposes and says, that deponent is not a party to the action, is over 18 years of age and resides at

That on

deponent served the within bill of costs and notice of taxation on

attorney(s) for
at

the address designated by said attorney(s) for that purpose by depositing a true copy of same enclosed in a postpaid properly addressed wrapper, in—a post office—official depository under the exclusive care and custody of the United States Postal Service within New York State.

Sworn to before me on

CFN # 109928521, OR BK 47786 PG 481, Page 6 of 7

HARLEM SUITES, LLC.                    Index No. 603179/08

        Plaintiff,

    -against-

231 NORMAN AVENUE, LLC, DAVID
YERUSHALMI, JOSEPH GOPIN,
JONATHAN RIGBI, and JONATHAN ILAN
OFIR,

        Defendants.

---

## MONEY JUDGMENT

---

Jed M. Weiss, Esq.
Cole Schotz Meisel Forman & Leonard, P.A.
A Professional Corporation
900 Third Avenue, 16th Floor
New York, New York 10022-4728
(212) 752-8000
Attorneys for Plaintiff Harlem Suites, LLC

FILED AND
DOCKETED
AUG 05 2010
AT
N.Y., CO. CLK'S OFFICE

August 04, 2010

CFN # 109928521, OR BK 47786 PG 482, Page 7 of 7

All of which we have caused by these presents to be exemplified and the Seal of our said County and Supreme Court to be hereunto affixed.

Witness, Hon. HON. RICHARD F. BRAUN Justice of the Supreme

J.S.C.

Court of the State of New York for the County of New York, the 25

day of *February* in the year of our Lord two thousand and

*Eleven* , and of our independence the two hundred and

*Thirty four*

*Norman Goodman*
County Clerk and Clerk of the
Supreme Court, New York County

Justice of the Supreme Court of the State of New York for the County of New York, the same being a Court of Record, do hereby certify that the foregoing attestation is due and proper form and by the proper officer.

Dated, New York,    FEB 28 2011    20 //

*Richard Freddi Braun*

Justice of the Supreme Court
of the State of New York.

State of New York,   } ss.:
County of New York,

I, NORMAN GOODMAN, County Clerk and Clerk of the Supreme Court of the State of New York, County of New York, do hereby certify that Hon. HON. RICHARD F. BRAUN whose name is subscribed to the preceding certificate is a Justice of the Supreme Court of said State in and for the County of New York, duly elected and qualified, and that the signature of said Justice to said certificate is genuine.

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the Seal of said County and Court this / day of *March* 20 // .

*Norman Goodman*
County Clerk and Clerk of the
Supreme Court, New York County.

No. F.    15804

CFN # 109⬚  ⬚  ⬚ ge ⬚ ed
09:11 AM, Broward County Commission,  Deputy Clerk 1067

ᒿ

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

HARLEM SUITES, LLC,                                          Index No. 603179-08

**AFFIDAVIT OF JED WEISS**

Plaintiff,

- against –

231 NORMAN AVENUE, LLC, DAVID
YERUSHALMI, JOSEPH GOPIN, JONATHAN
RIGBI, and JONATHAN ILAN OFIR,

Defendants.

THIS IS NOT AN OFFICIAL COPY

STATE OF NEW YORK      )
                                          ) SS.:
COUNTY OF NEW YORK  )

JED M. WEISS, being duly sworn, deposes and says:

1.     I am an associate with the law firm of Cole, Schotz, Meisel, Forman & Leonard,

P.A. ("Cole Schotz"), attorneys for Plaintiff/Judgment Creditor Harlem Suites, LLC ("Harlem

Suites"), in this matter.  In this capacity, I have personal knowledge of the facts stated below.

2.     The Creditor in the above referenced matter pursuant to a Judgment dated and

entered in the Supreme Court, New York County, on August 5, 2010 (the "Judgment") is Harlem

Suites, LLC, having an address of 350 Fifth Avenue, New York, NY, 10118.

3.     Harlem Suites is represented by Kelly B. Puckett, Esq., of the law firm Bobo,

Ciotoli, Bocchino, White & Buigas, P.A., Landmark Center One, Suite 510, 315 East Robinson

Street, Orlando, FL, 32801.

4.     Joseph Gopin is a Judgment Debtor pursuant to the Judgment with an address of

1895 NW 76th Way, Hollywood, FL, 33024.

46968/0001-7404500v1

②

CFN # 109928522, OR BK 47786 PG 484, Page 2 of 2

JED M. WEISS

Sworn and subscribed to
before me this 7th day
of March, 2011.

Notary Public

THOMAS J. VOGEL
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01VO6219631
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES MARCH 29, 2014

THIS IS NOT AN OFFICIAL COPY

2

46968/0001-7404500v1

**<u>Exhibit 3</u>**
**(Settlement Agreement with Gregory)**

## Memorandum of Understanding

This Memorandum of Understanding is entered into on this 20th day of September, 2012 between Joseph Cohen, an individual and Nickey Gregory Company of Miami LLC, a Florida Limited Liability Company.

Whereas, Nickey Gregory, as judgment creditor, obtained a judgment in the amount of 85,424.35 against the judgment debtor, Hallandale Farmers Market, LLC, inclusive of attorneys fees, costs and expenses.

Whereas, the parties understand and agree that the judgment debt, to date, totals One Hundred Thousand Dollars ($100,000.00).

Whereas, the judgment creditor initiated proceeding supplemental against various individuals & corporate entities, including Joseph Cohen, an individual.

Whereas, Mr Cohen has appeared for a deposition duces tecum on behalf of himself and the corporate entities on September 20, 2012.

Whereas, in lieu of the deposition & to further avoid additional attorneys fees & expenses from being incurred, the ~~Di~~ Joseph Cohen, ~~after consulting with counsel~~, has made the decision to be personally responsible for the judgment debt of One Hundred Thousand Dollars ($100,000)

①

NOW Therefore, Mr Cozen understands &
agrees to the following payment plan to
satisfy the judgment debt.

(1) Joseph Cozen agrees to tender a
payment in the amount of $2000.00
to the Trust Account of The Law Offices
of Geoffrey & Ittleman, P.A., as counsel
for the judgment creditor, within 30 days
from the date of the Memorandum of
Understanding.

(2) Joseph Cozen further agrees to pay
an additional $2000.00 thirty days
following the first payment.

(3) Joseph Cozen agrees that the third
payment shall be the amount of One
Thousand Dollars ($1000.00) within thirty
days following the second payment

(4) Joseph Cozen further agrees that the
fourth payment shall total Two Thousand
Dollars ($2000.00) with the payment
due & owing within 30 days following
the third payment.

(5) Joseph Cozen further agrees that the
fifth payment shall total Two Thousand
Dollars ($2000.00) due & owing within
30 days following the fourth payment

(6) All subsequent payments shall be
in the amount of One Thousand
Dollars ($1000.00) until the judgment
debt is paid in full.   (3)

JCL

(7) All payments shall be sent by check, wire or other negotiable instrument to The Trust Account of Geoffrey Williams PA. 440 N. Andrews Ave Ft Lauderdale FL 33301.

(8) All payments are due & owing on the 20th of each month. The payments shall be deemed late on the ___ day of the month. Mr Boren shall be obligated to pay a late fee in the amount of $100.00 co/mo. for any payments that are late

(9) In the event that payments are not received by the ___ of the month, Mr Williams shall extend a ___ email to the Boren, as counsel for the Boren, that shall provide Mr Boren with a 5 day right to cure the default

(10) Failure to cure the default 17 by on before 5 days following the correspondence shall entitle the judgment creditor to proceed with an immediate judgment against Mr Boren, an individual. The judgment will be non-dischargable in bankruptcy and will be in the amount of the judgment debt less credits for payments previously made.

(11) In the event of such judgment against Mr Boren, the judgment creditor shall have the right to further seek reasonable attorneys fees, costs & expenses associated with Williams.

(12) The Court retains jurisdiction to

(3)

(420)   Jr.

before the memorandum of understanding

(13) A formal agreement memorializing
the terms & conditions contained herein
shall be typed, signed & notarized by the
parties

(14) This is a memorandum of understanding
each party shall have the right to obtain
counsel to review the terms & conditions
contained herein prior to the actual agreement
being signed. The payment obligations & the
Goyer's personal responsibility for the
judgment debt (as opposed to the corporate
employee defendants) ~~shall remain~~ are fully
bound by the Memorandum of Understanding.
All other terms & conditions, however,
may be ~~revised~~ reviewed & ~~revised~~ negotiated
if necessary, prior to the formal agreement
being executed.

Hickey Gregory Lorrain
Miami, LLC

By: _____          By: _____
Geoffrey Ittleman, Esq.                      Joseph Goyer,
Counsel for Hickey                            an individual
Gregory

(4)

**<u>Exhibit 4</u>**
**(Excerpt Of The First Two Pages Of Kosher Center's Catering Menu)**



# KOSHER CENTRAL MARKET CATERING

## Service

## MENU

  

**5650 Stirling Rd. Hollywood, FL 33021 • 954-963-1313**
**koshercentral@gmail.com**



Hi! My name is Yossi Gopin, and I am the founder of Kosher Central, the "One Stop Kosher Shop."

It is my desire to make YOUR shopping experience a pleasant, convenient, and successful one, so that you'll keep coming back for more.

What does all that mean to YOU, the customer?

It means that you will find ALL of your kosher needs at our in-house bakery, butchery, deli and grocery. Kosher Central has whatever you need, at the highest kosher culinary standards and quality.

We also offer the best "bang for your buck" catering in South Florida. We are first in customer service, quality, taste and professionalism. We help to ensure your event runs smoothly and is a wonderful experience for you and your guests to enjoy. We will meet, and surpass all of your expectations.

I am personally involved in all aspects of the Kosher Central experience and your input is valuable to me. So the next time you stop by, please say hello, and tell me how you feel we can do a better job serving you. Please also keep my phone number handy, and if I can ever be of service to you, do not hesitate to call. I will be happy to assist you.

I have always believed that Kosher does not mean we have to do without, so at Kosher Central, we strive for quality and variety. We are, and will continue to be, your "Leading Kosher Standard" in South Florida.

Yossi Gopin, *CEO*
954-963-1313
ygopin@gmail.com

**Exhibit 5**
**(Request for Temporary Injunction and/or Appointment of Receiver)**

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

SHMUEL LEVY

     Plaintiff,

CIVIL DIVISION **11-16032**

v.

CASE NO.:

JOSEPH GOPIN

     Defendant.

_____/

### REQUEST FOR TEMPORARY INJUNCTION AND/OR APPOINTMENT OF RECEIVER

COMES NOW, the Plaintiff, SHMUEL LEVY, by and through his undersigned attorney and requests this honorable Court to issue a Temporary Injunction and/or Appoint a Receiver against Defendant's corporation and in support thereof alleges as follows:

### LEGALLY RELVANT FACTS

1.  Plaintiff and Defendant were fifty percent (50%) owners of the shares of a Florida corporation, YGSL Holdings, LLC, (hereinafter "the business") located in Broward County, Florida.

2.  On August 13, 2010, Plaintiff and Defendant entered into an Agreement that enabled Defendant to purchase Plaintiff's shares in the company for One Hundred Ten Thousand Dollars ($110,000.00) in addition to an assumption of debt in the amount of Fifty Thousand Dollars ($50,000). A copy of said contract is attached hereto as Exhibit A.

3.  Payments were to be made by checks directly from the operating account of the business in the amount of one thousand dollars ($1,000.00) per week.

4.  On May 25, 2011, the Defendant repudiated the contract by explicitly refusing to make any additional payments pursuant to the contract.

5. The contract provides Plaintiff with a security interest in the business equal to the balance owed by the Defendant in the event of a default.

6. The Defendant has fraudulently transferred over Two Hundred Fifty Thousand Dollars ($250,000.00) out of the business's operating account, in order to swindle the Defendant. A copy of the business account statements is attached hereto as Exhibit B.

## INJUNCTION

7. Plaintiff re-alleges and reaffirms paragraphs 1-6 of this pleading.

8. The Plaintiff would be immediately and irreparably damaged if Defendant is allowed to continue withdrawing money from the business's account.

9. If the Defendant were to learn of this law suit before an injunction were in place, he will transfer the funds out of the business's operating account in order to make the business insolvent.

10. Defendant will continue to withdraw funds from the business account at an alarming rate until the funds in the account are depleted and no longer retrievable by either party unless an injunction is in place.

11. If Defendant depletes all assets of the business, Plaintiff's security interest in the business equal to the balance owed by the Defendant in the event of default would be meaningless.

12. Plaintiff, pursuant to Florida Rule of Civil Procedure 1.610, in the interest of preventing immediate and irreparable harm to the Plaintiff, prays for an injunction against Defendant.

## APPOINTMENT OF RECEIVER

13. Plaintiff re-alleges and reaffirms paragraphs 1-6 and 8-11 of this pleading.

14. Plaintiff and Defendant, in the interest of equity, would have the assets in the business protected by appointing a receiver pursuant to Florida Rule of Civil Procedure 1.620.

WHEREFORE, Plaintiff moves the court to issue a temporary injunction, without notice, to enjoin the Defendant from accessing the business's accounts and assets, or alternatively appointment of receiver to prevent immediate and irreparable damage to Plaintiff.

Respectfully Submitted,

_____

DAVID LOW, ESQ.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent to the Broward County Clerk of Court, 201 SE 6th Street, Ft. Lauderdale, Florida 33301.

_____

DAVID LOW, ESQ.
28 West Flagler Street, 10th Floor
Miami, Florida 33130
Phone: (305) 728-1931
Fax: (305) 675-2685
FBN: 67957

08/13/2010

1. This represents a binding agreement between Joseph Gopin and Shmuel Levy. Shmuel Levy (seller) agrees to transfer his 50% ownership in YGSL Holdings, LLC to Joseph Gopin ( Buyer).

Purchase Price: 110,000 plus paragraph 3

2. Payment schedule:

10,000 to be paid on 8/18/2010

100,000 to be paid in weekly payments of  1,000 beginning 08/25/2010 with automatic checks directly out of operating account.

3. Buyer agrees to assume all liabilities of the business, including the balance owed to Jerome Cohen and Wendy Rothenberg.
4. Additionally, buyer agrees to further discuss an expedited payment schedule if a new partner comes in to business.

5. Buyer agrees that in event of default on payment business is security equal to the balance owed.

6. Buyer agrees to further discuss any additional terms and conditions based on default.

Joseph Gopin                                 Shmuel Levy

Buyer                                        Seller

Exhibit A

11 - 1 6 0 3 2

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

SHMUEL LEVY

    Plaintiff,                                        CIVIL DIVISION

v                                                               CASE NO.:

JOSEPH GOPIN

    Defendant

_____/

## AFFIDAVIT IN SUPPORT OF REQUEST FOR TEMPORARY INJUNCTION AND/OR APPOINTMENT OF RECEIVER

STATE OF NEW YORK
COUNTY of _Kings_

    BEFORE ME, the undersigned authority, personally appeared SHMUEL LEVY, who after being first by me duly sworn, deposes and says:

1. That I am the Plaintiff in the above styled cause.

2. That Defendant and I were fifty percent (50%) owners of the shares of a Florida corporation, YGSL Holdings, LLC, (hereinafter "the business") located in Broward County, Florida.

3. That the nature of the business is that of a supermarket and catering company.

4. That on May 25, 2011, Defendant explicitly refused to make any additional payments under the contract we made.

5. That in total, Defendant, pursuant to the contract, payments in the amount of approximately fifty-eight thousand ($58,000.00) were made to me at the time Defendant repudiated the contract.

6. That prior to Defendant's repudiation of the contract, he informed me that he had solicited investors to purchase the business, resulting in Defendant receiving over three hundred thousand dollars ($300,000.00) for Defendant's sale of an interest in the business.

7. That Defendant concealed from the investors the fact that I had an interest in the business.

8. That Defendant has made multiple fraudulent transfers of the funds (in excess of two-

hundred and fifty thousand dollars ($250,000) invested by the investors in an attempt
to make the business insolvent and defraud me of my interest in the business.

9. That the amount of money taken from the bank accounts of the business by Defendant
is not normal for the business

10. That Defendant is transferring money from one business to another in an effort
to keep his own business afloat at a rate which will cause the business to become
insolvent.

11. That if a temporary restraining order or an appointment of receiver is not granted, the
litigation expenses will increase and I will suffer immediate irreparable injury, loss,
or damages, as I will be unable to sustain a lawsuit.

FURTHER AFFIANT SAYETH NAUGHT.

SHMUEL LEVY, Affiant/Plaintiff

SWORN TO AND SUBSCRIBED
BEFORE ME BY SHMUEL LEVY,
WHO HAS PRODUCED _____ AS
PERSONAL IDENTIFICATION, ON THIS ___ DAY OF
JUNE, 2011.

NOTARY PUBLIC, State of New York

My commission expires

JOSEPH Y. BALISOK
NOTARY PUBLIC-STATE OF NEW YORK
No. 02BA6225166
Qualified In Kings County
My Commission Expires July 19 2014

**Exhibit 6**
**(Collateral Assignment of Lease)**

# COLLATERAL ASSIGNMENT OF LEASE

**THIS COLLATERAL ASSIGNMENT OF LEASE** (the "Assignment"), dated as of March 7, 2011 is from YGSL HOLDINGS, LLC, a Florida limited liability company, (the "Debtor") to M & M Chow LLC, a Florida limited liability company (the "Creditor").

**WHEREAS,** the Debtor is a party to that certain promissory note, dated as of March 7, 2011 (the "Note"), by and between the Debtor and the Creditor;

**WHEREAS,** the parties anticipate that additional promissory notes will be executed by Debtor in favor of Creditor totaling in the aggregate more than One Million ($1,000,000.00) Dollars; and

**WHEREAS,** pursuant to the agreement of the parties, Debtor assigned to Creditor that certain lease dated as of October 1, 2009, between Debtor, as the Lessee therein, and ARSC, Inc., a Florida corporation, as the Landlord therein (the "Lease") with respect to the property located at 5650 Stirling Road, Hollywood, Florida (the "Premises"); see Exhibit "A" hereto which is incorporated herein and made a part hereof.

**NOW, THEREFORE,** in consideration of the premises and to induce the Creditor to lend money to the Debtor and to consummate the transactions contemplated therein, and for other good and valid consideration, the receipt and sufficiency of which is hereby acknowledged by the Debtor, the Debtor hereby agrees with and for the benefit of Creditor as follows:

1.     The Debtor hereby grant to the Creditor a security interest in, and sell, assign, transfer and set out unto the Creditor, all of the Debtor' right, title and interest in and to the Lease.

2.     The Debtor acknowledge and agree that this Assignment shall not in any way obligate the Creditor or any of its successors and assigns to perform any of the now existing or hereafter accruing obligations of the Debtor under the Lease, and the Debtor agrees to perform any and all obligations (including the payment of any and all rents liabilities or assessments) of the Debtor under the Lease, whether heretofore or hereafter accruing or arising, all with the same effect as though this Assignment had not been executed or delivered by the Debtor. All of the foregoing interest, properties, privileges and rights hereby assigned are hereinafter referred to as "Assigned Interests".

3.     This Assignment is made and given as collateral security for the payment of any and all liabilities of the Debtor to the Creditor due and to become due, whether now existing or hereafter arising, direct or indirect, absolute or contingent, and howsoever evidenced or acquired, including, without limitation, the indebtedness evidenced by that certain promissory note of even date herewith, in the principal amount of One Hundred Fifty Thousand ($150,000.00) Dollars (the "Note") and shall remain in full force

and effect until all of said current and future liabilities are paid. This Assignment is a material inducement for the Creditor to enter into the loan and to consummate the transactions contemplated therein.

4. The Debtor does hereby irrevocably constitute and appoint the Creditor its true and lawful attorney, with full power of substitution for it and in its name, place and stead, to ask, demand, collect, receive, receipt for, sue for, compound and give acquittance for any and all sums or properties which may be or become due, payable or distributable for or in respect to the Assigned Interests, with full power to settle, adjust or compromise any claim thereunder or therefor as fully as the Debtor could itself do, and to endorse or sign the name of the Debtor on all commercial paper given in payment or in part payment thereof, and all documents of satisfaction, discharge or receipt required or requested in connection therewith, and in its discretion to file any claim or take any other action or proceeding, either in its own name or in the name of the Debtor, or otherwise, which the Creditor may deem necessary or appropriate to collect or otherwise realize upon any and all or the Assigned Interests, or which may be necessary or appropriate to protect and preserve the right, title and interest of the Creditor in and to such Assigned Interests and the security intended to be afforded hereby.

5. Without limiting the foregoing, the Debtor hereby further covenant that Debtor will, upon request of the Creditor, execute and deliver such further instruments and do and perform such other acts and things as the Creditor may reasonably deem necessary or appropriate to more effectively vest in and secure to the Creditor the Assigned Interests or other rights or interest due or hereafter to become due.

6. The Debtor hereby authorizes and directs that after the occurrence of any default in the performance or payment when due, whether by acceleration of otherwise, of the Note, or any additional future notes, from or any obligation or liability of the Debtor to the Creditor and upon the sending by the Creditor of written notice of such default to the Debtor, all of Debtor's interests in and to the Lease shall be automatically assigned, granted, and conveyed to Creditor and Debtor agree to surrender the Premises and to allow Creditor to take possession thereof.

7. Upon any default by the Debtor in the payment of any present or future obligations or liabilities of the Debtor to the Creditor which default with respect to the Note or notes would occur if the Debtors fail to render payment in accordance with the terms of the Note or notes to the Creditor in addition to the rights, powers and authorities to collect the sums assigned hereunder, or any other remedies or rights it may have, shall have the right to, and may, proceed to exercise with respect to the Assigned Interests all of the rights, options and remedies of a secured party upon default as provided for in the Uniform Commercial Code of Florida (the "Code"). Any requirement of the Code of reasonable notice shall be made if such is mailed,

2

postage prepaid, to the Debtor at its address as shown on the records of the Creditor at least five (5) days before the time of the sale, disposition or other event or thing giving rise to the required notice. The reasonable expenses of disposing of the Assigned Interests, together with court costs and reasonable attorneys' fees, incurred in realizing upon the Assigned Interests or in enforcing this Assignment may be deducted from the proceeds of disposition of the Assigned Interests.

8. The Debtor will not authorize or consent to any amendment, assignment, revision or modification of the Lease without the prior written consent of the Creditor.

9. The Debtor represent and warrant to the Creditor that the Debtor has full right, power and authority to make this Assignment, and that neither the Assigned Interests nor any moneys distributable in respect thereof are subject to any lien, encumbrance or security interest, other than the security interest granted the Creditor hereunder.

10. Without limiting any rights, remedies or privileges that the Creditor may have under the terms of any note or other instrument representing any obligation or indebtedness of the Debtor to the Creditor, it is understood and agreed that, upon the occurrence of any of the following events:

(a) involuntary termination or dissolution or other winding up of the Debtor whether in bankruptcy, reorganization or in receivership proceedings of otherwise; or

(b) the failure of the Debtor to observe or perform any covenant herein contained; or

(c) any representation or warranty herein made shall prove to be untrue in any material respect as of the date of its making; or

(d) any default in the payment of any principal or interest of any of the indebtedness or obligations hereby secured; or

(e) the institution of legal action or the threat of legal action against the Debtor or the Debtor's assets; then, any term in any note or other instrument representing any obligation or indebtedness of the Debtor to the Creditor to the contrary notwithstanding, the Creditor shall have the right by notice in writing given to the Debtor by mailing the same to the Debtor at his address then appearing on the records of the Creditor to declare such obligation or indebtedness due and payable from the Debtor without presentment, demand or other notice of any kind.

3

11.  The Debtor hereby covenants and agrees to send to the Creditor copies of all notices and communications with respect to the Lease which may be sent to or received from the Debtor.

12.  The satisfaction or discharge of any part of the indebtedness, obligations and liabilities hereby secured shall not in any way satisfy or discharge this Assignment but this assignment shall remain in full force and effect so long as any amounts remains unpaid on any such indebtedness, obligations and liabilities.  This Assignment shall be binding upon the Debtor and upon the legal representatives, successors and assigns of the Debtor and shall inure to the benefit of the Creditor and its successors and assigns.  This Assignment may be executed in any number of counterparts, each constituting an original but all together one and the same instrument.

13.  THE DEBTOR HEREBY, AND THE CREDITOR BY ITS ACCEPTANCE OF THIS COLLATERAL ASSIGNMENT OF LEASE, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE THE RIGHT EITHER MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE COLLATERAL ASSIGNMENT OF LEASE AND ANY NOTE CONTEMPLATED TO BE EXECUTED IN CONJUNCTION HEREWITH OF ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF EITHER PARTY.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE CREDITOR ACCEPTING THIS COLLATERAL ASSIGNMENT OF LEASE.

**IN WITNESS WHEREOF,** the Debtor has hereunto set his/her hand and seal all as of this 7th day of March, 2011.

WITNESSES:

DEBTOR:

_____

As to all _STEWART MIRMELLI_

_____

CREDITOR:

_____

As to all _DIANA CRUZ_

_____

4

STATE OF FLORIDA          )
                              ) SS:

COUNTY OF MIAMI-DADE   )

     I **HEREBY CERTIFY** that on this day, before me, an officer duly authorized to administer oaths and take acknowledgments, personally appeared CHAIM MENDELSOH, Managing Member of YGSL Holdings, LLC, a Florida limited liability company, known to me to be the persons described in, who provided valid Florida Driver's Licenses, and who executed the foregoing instrument, acknowledging before me that he executed same for the purposes therein intended and with the proper and legal authority to do so.

     **WITNESS** my hand and official seal in the City of _MIAMI_ and County of _MIAMI-DADE_ this 7th day of March, 2011.



NOTARY PUBLIC
State of Florida at Large

My Commission Expires:

Notary Public State of Florida
Stewart Mirmelli
My Commission DD670599
Expires 05/31/2011



**<u>Exhibit 7</u>**
**(May 21, 2003 Deed Showing Gopin's Purchase of 1019 Lincoln Property)**

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2003100201339001001E6850

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 4 |
|---|---|---|
| Document ID: 2003100201339001 | Document Date: 05-21-2003 | Preparation Date: 10-02-2003 |

Document Type: DEED
Document Page Count: 3

| PRESENTER: | RETURN TO: |
|---|---|
| REALTY-SKYLINE RESEARCH LLC | JOSEPH GOPIN |
| 175 REMSEN STREET | 706 EASTERN PARKWAY |
| ATLANTIC LAND AL2058 (TM) | BROOKLYN, NY 11213 |
| BROOKLYN, NY 11201 | |
| 718-306-1100 | |

## PROPERTY DATA

| Borough | Block | Lot | | Unit | Address |
|---|---|---|---|---|---|
| BROOKLYN | 1257 | 84 | Entire Lot | | 1019 LINCOLN PLACE |

**Property Type:** DWELLING ONLY - 2 FAMILY

## CROSS REFERENCE DATA

CRFN _____ *or* Document ID _____ *or* Year _____ Reel _____ Page _____ *or* File Number _____

## PARTIES

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| SECRETARY OF HOUSING AND URBAN DEVELOPMENT | JOSEPH GOPIN |
| NO # | 706 EASTERN PARKWAY # 1D |
| WASHINGTON, DC 00000 | BROOKLYN, NY 11213 |

## FEES AND TAXES

| Mortgage | | | Recording Fee: $ | 52.00 |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | Affidavit Fee: $ | 0.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax Filing Fee: | |
| Exemption: | | | $ | 25.00 |
| TAXES: | | | NYS Real Estate Transfer Tax: | |
| County (Basic): | $ | 0.00 | $ | 1,406.00 |
| City (Additional): | $ | 0.00 | | |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |

NYC HPD Affidavit in Lieu of Registration Statement

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed    11-06-2003 15:06
City Register File No.(CRFN):
**2003000447803**

*John J. Lauriere*
*City Register Official Signature*

374-254141            **BARGAIN AND SALE DEED**

**THIS INDENTURE,** made as of the _21ST_ day of _MAY_____, 2003,  **BETWEEN**

MEL MARTINEZ, Secretary Of Housing and Urban Development, of Washington, D.C.,  acting by and through the Federal Housing Commissioner,            Grantor, **and**

**JOSEPH GOPIN**
706 Eastern Parkway, #1D, Brooklyn, New York, 11213    Grantee,

**WITNESSETH:** That the Grantor, for and in consideration of the sum of <u>$351,063.00</u> lawful money of the United States of America, unto him/her will and truly paid by the Grantee(s) at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged, hath granted, bargained, sold, aliened, enfeoffed, released and confirmed, and by these presents doth grant, bargain, sell, alien, enfeoff, release and confirm unto the Grantee(s),

 **ALL** that certain plot, piece or parcel of land, situate, lying and being

SEE SCHEDULE A ATTACHED HERETO.

**SAID PREMISES** also known as and by the street address: 1019 Lincoln Place, Brooklyn, New York.

DISTRICT:          SECTION:  **5**    BLOCK: **1257** LOT:  **84**   COUNTY:  **KINGS**

**BEING THE SAME PREMISES** acquired by deed from WASHINGTON MUTUAL HOME LOANS, INC., dated 2/20/02, recorded 9/19/02 in Reel 5804 page 771.
**BEING** the same property acquired by the Grantor first part pursuant to the provisions of the National Housing Act, as amended (12 U.S.C. 1701 et seq.) and the Department of Housing and Urban Development Act (79 Stat. 667).

**TOGETHER WITH** all right, title and interest, if any, of the Grantor in and to any streets and roads abutting theA·    above described premises to the center lines thereof.

**TOGETHER WITH** the appurtenances and all the estate and rights of the Grantor in and to said premises;

**TO HAVE AND TO HOLD** the premises herein granted unto the Grantee(s), and to the heirs, distributees and assigns of the said Grantee(s) forever.

**SUBJECT TO ALL** covenants, restrictions, reservations, easements, conditions and rights appearing of record; and **SUBJECT** to any state of facts an accurate survey would show.

**AND THE** Grantor covenants that he has not done or suffered anything whereby the said premises have been incumbered in any way whatsoever, except as aforesaid.

**FIRST AMERICAN TITLE INSURANCE COMPANY**
**Title No.AL2058K**

**SCHEDULE A**
**DESCRIPTION**

All that certain plot, piece or parcel of land, with building and improvements thereon erected, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of Lincoln Place, distant 133 feet Westerly from the corner formed by the Northerly side of Lincoln Place with the Westerly side of Kingston Avenue;

RUNNING THENCE Northerly parallel with Kingston Avenue and part of the distance through a party wall 100 feet;

THENCE Westerly parallel with Lincoln Place 20 feet;

THENCE Southerly parallel with Kingston Avenue and part of the distance through a party wall 100 feet to the Northerly side of Lincoln Place;

THENCE Easterly along the Northerly side of Lincoln Place 20 feet to the point or place of BEGINNING.

ISSUED THROUGH THE OFFICE OF:
**Atlantic LandTitle and Abstract, Ltd.**
**5417 18th Avenue**
**Brooklyn, NY 11204**
(718) 331-6400
Fax 331-0031

**THE GRANTOR** covenants that if any improvements, repairs or alterations to the premises have been commenced and have not been completed at least four months before the recording of this deed, the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of improvement, and that said Grantor will apply the same first to the payment of the cost of improvement before using any part of the total of the same for any other purpose.

**THE WORD** "party" shall be construed as if it reads "parties" whenever the sense of this indenture so requires.

**IN WITNESS WHEREOF,** the undersigned has set her hand and seal in Blue Bell, Pennsylvania as attorney-in-fact for and on behalf of the Secretary of Housing and Urban Development ("HUD"), by virtue of a certain limited power of attorney dated March 13, 2003 given by the Secretary of HUD and recorded in the Office of the City Register of Kings County on                    in                    , under authority and by virtue of 62 F.R. 54465 (10/20/97).

In Presence of:

MEL MARTINEZ
Secretary of Housing and Urban Development

By: _____ (SEAL)
DALE ALBERTELLI
(of First Preston Management)
Attorney in Fact

**COMMONWEALTH OF PENNSYLVANIA**  )
                                                              ) ss.:
**COUNTY OF** Montgomery  )

On this 13 day of May , 2003, before me, the undersigned, personally appeared

**DALE ALBERTELLI**

personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in Blue Bell, Pennsylvania.

Notary Public

> Notarial Seal
> Colleen McEntee, Notary Public
> Whitpain Twp., Montgomery County
> My Commission Expires July 14, 2004

**BARGAIN AND SALE DEED**

**SECRETARY OF HUD**

to

**JOSEPH GOPIN**

RETURN BY MAIL TO:
Joseph Gopin
706 Eastern Pkwy
Brooklyn, NY 11213

**DISTRICT            SECTION** 5 **BLOCK** 1257 **LOT** 84 **COUNTY** Kings

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**



2003100201339001001SA6D1

| SUPPORTING DOCUMENT COVER PAGE | | PAGE 1 OF 1 |
|---|---|---|
| **Document ID: 2003100201339001** | Document Date: 05-21-2003 | Preparation Date: 10-02-2003 |
| Document Type: DEED | | |

**SUPPORTING DOCUMENTS SUBMITTED:**

|  | Page Count |
|---|---|
| RP - 5217 REAL PROPERTY TRANSFER REPORT | 1 |
| SMOKE DETECTOR AFFIDAVIT | 1 |

FOR CITY USE ONLY

**C1. County Code** [ ] [ ]

**C2. Date Deed Recorded** [ / / ] Month Day Year

**C3. Book OR C5. CRFN** [ ] **C4. Page** [ ]

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES
**RP - 5217NYC**
(Rev 11/2002)

## PROPERTY INFORMATION

**1. Property Location** | 1019 | LINCOLN PLACE | BROOKLYN | 11213
STREET NUMBER | STREET NAME | BOROUGH | ZIP CODE

**2. Buyer Name** | GOPIN | JOSEPH
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**3. Tax Billing Address** Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY | FIRST NAME

STREET NUMBER AND STREET NAME | CITY OR TOWN | STATE | ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** [ ] # of Parcels OR [ ] Part of a Parcel

**4A. Planning Board Approval - N/A for NYC**
**4B. Agricultural District Notice - N/A for NYC**

Check the boxes below as they apply:
**6. Ownership Type is Condominium** [ ]
**7. New Construction on Vacant Land** [ ]

**5. Deed Property Size** [ ] FRONT FEET X [ ] DEPTH OR [ ] ACRES

**8. Seller Name** | U.S. DEPARTMENT OF H.U.D.
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

| A | One Family Residential | C | Residential Vacant Land | E | Commercial Apartment | G | Entertainment / Amusement | I | Industrial |
| B | ✓ 2 or 3 Family Residential | D | Non-Residential Vacant Land | F | | H | Community Service | J | Public Service |

## SALE INFORMATION

**10. Sale Contract Date** | 3 / 4 / 03
Month Day Year

**11. Date of Sale / Transfer** | 5 / 21 / 03
Month Day Year

**12. Full Sale Price** | 3 5 1 , 0 6 3

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) Please round to the nearest whole dollar amount.

**13. Indicate the value of personal property included in the sale** [ ]

**14. Check one or more of these conditions as applicable to transfer:**

| A | | Sale Between Relatives or Former Relatives |
| B | | Sale Between Related Companies or Partners in Business |
| C | | One of the Buyers is also a Seller |
| D | ✓ | Buyer or Seller is Government Agency or Lending Institution |
| E | | Deed Type not Warranty or Bargain and Sale (Specify Below) |
| F | | Sale of Fractional or Less than Fee Interest ( Specify Below ) |
| G | | Significant Change in Property Between Taxable Status and Sale Dates |
| H | | Sale of Business is Included in Sale Price |
| I | | Other Unusual Factors Affecting Sale Price ( Specify Below ) |
| J | | None |

## ASSESSMENT INFORMATION – Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class** | B 1 | **16. Total Assessed Value** (of all parcels in transfer) | 16,896

**17. Borough, Block and Lot / Roll Identifier(s)** ( If more than three, attach sheet with additional identifier(s) )

5-1257-84

## CERTIFICATION

I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and I understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments.

**BUYER**

X _____ BUYER SIGNATURE | 5/21/03 DATE

706 | EASTERN PKWY
STREET NUMBER | STREET NAME (AFTER SALE)

BROOKLYN | NY | 11213
CITY OR TOWN | STATE | ZIP CODE

**BUYER'S ATTORNEY**

LAST NAME | FIRST NAME

646 - 262 - 0500
AREA CODE | TELEPHONE NUMBER

**SELLER**

Laurence W. Schein | 5/21/2003
SELLER SIGNATURE | DATE

Affidavit of Compliance with Smoke Detector Requirement for One and-Two Family Dwellings

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## ~~FOR ONE- AND TWO-FAMILY DWELLINGS~~

State of New York )

              ) SS.:

County of  Kings )

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and

**109  LINCOLN  PLACE**
_Street Address_                                               _Unit/Apt._

**BROOKLYN**      New York,     **1257**     **84**     (the "Premises");
_Borough_                                _Block_        _Lot_

grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

That the Premises is a ~~one or~~ _THREE_ family dwelling, ~~or a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke-detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;~~

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

| U.S. DEPT. OF HUD | JOSEPH GOPIN |
|---|---|
| _Name of Grantor (Type or Print)_ | _Name of Grantee (Type or Print)_ |
| _Laurence W. Scheer_ | X _____ |
| AS ATTY. ONLY  _Signature of Grantor_ | |
| UPON INFORMATION & BELIEF | _Signature of Grantee_ |
| Sworn to before me | Sworn to before me |
| this __21st__ date of __MAY__  2003 | this __21__ date of __MAY__  2003 |

CINDY E. SELEVAN
NOTARY PUBLIC, State of New York
No. 01SC6039881
Qualified in Nassau County
Commission Expires April 10, 2006

CINDY E. SELEVAN
NOTARY PUBLIC, State of New York
No. 01SC6039881
Qualified in Nassau County
Commission Expires April 10, 2006

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.

**<u>Exhibit 8</u>**
**(December 19, 2012 Quit Claim Deed From Gopin to 1019 Lincoln LLC))**

## NYC DEPARTMENT OF FINANCE
## OFFICE OF THE CITY REGISTER

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.



2012123100507001001E5AA5

### RECORDING AND ENDORSEMENT COVER PAGE

PAGE 1 OF 4

| | | |
|---|---|---|
| **Document ID: 2012123100507001** | Document Date: 12-19-2012 | Preparation Date: 12-31-2012 |
| Document Type: DEED | | |
| Document Page Count: 3 | | |

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| SAXONY TITLE SERVICES LLC | 1019 LINCOLN LLC |
| 3512 QUENTIN ROAD 2ND FLOOR | 7561 SHERIDAN STREET |
| (HOLD-FOR-PICKUP-SAXONY) ST-REC-218 | HOLLYWOOD, FL  33024 |
| BROOKLYN, NY  11234 | |
| 718-692-1800 | |
| szayas@saxonytitle.com | |

### PROPERTY DATA

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 1257 | 84 | Entire Lot | 1019 LINCOLN PLACE |

**Property Type:** DWELLING ONLY - 2 FAMILY

### CROSS REFERENCE DATA

CRFN_____  *or*  Document ID_____  *or*  _____ Year_____  Reel ___  Page _____  *or*  File Number_____

### PARTIES

| **GRANTOR/SELLER:** | **GRANTEE/BUYER:** |
|---|---|
| JOSEPH GOPIN | 1019 LINCOLN LLC |
| 1895 NW 76 WAY | 7561 SHERIDAN STREET |
| REMBROKE PINES, FL  33024 | HOLLYWOOD, FL  33024 |

### FEES AND TAXES

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 125.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 0.00 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 40.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed          01-09-2013 16:16 | | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | **2013000011271** | | |
| Recording Fee: | $ | 52.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

*Annette M. Hill*

***City Register Official Signature***

Block: 1257
Lot: 84.

**Prepared By:**

|

|

|

|

|

**After Recording Return To:**
1019 Lincoln LLC
7561 Sheridan St
Hollywood, Florida 33024

|

|

|

|

|

|

|

|

SPACE ABOVE THIS LINE FOR RECORDER'S USE

# QUIT CLAIM DEED

On December 19, 2012 THE GRANTOR(S),

- Joseph Gopin, a single person,

for and in consideration of:   $10,000.00      and other good and valuable consideration
conveys, releases and quit claims to the GRANTEE(S):

- 1019 Lincoln LLC, Zalman Korf, Manager residing at 7561 Sheridan St, Hollywood,
Broward County, Florida 33024

the following described real estate, situated in Brooklyn, in the County of Kings, State of New
York:

Legal Description: Block 1257 Lot 84

Grantor does hereby grants, bargain and sell all of the Grantor's rights, title, and interest in and to
the above described property and premises to the Grantee(s), and to the Grantee(s) heirs and
assigns forever, so that neither Grantor(s) nor Grantor's heirs, legal representatives or assigns shall
have, claim or demand any right or title to the property, premises, or appurtenances, or any part
thereof.

Tax Parcel Number: Block 1257 Lot 84
Mail Tax Statements To:
1019 Lincoln LLC
7561 Sheridan St
Hollywood, Florida 33024

[SIGNATURE PAGE FOLLOWS]        Page 1 of 2

**IN WITNESS WHEREOF,** The said first party has signed and sealed these presents the day and year first above written. Signed, sealed and delivered in presence of:

_____
Signature of Witness

_Daniel Baratz_
Print name of Witness

_____
Signature of Witness

_____
Print name of Witness

_____
Signature of First Party, Grantor

_____
Print name of First Party

_____
Signature of First Party, Grantor

_____
Print name of First Party

STATE OF _FL_
COUNTY OF _Broward_                    }
On _12/19/12_                before me,                                         ,
appeared
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary

(seal) PHILIP BARATZ
MY COMMISSION # DD 853521
EXPIRES: February 19, 2013
Bonded Thru Notary Public Underwriters

_12/19/12_

# SEAL

Affiant ___Known____Produced ID
Type of ID _____

_____
Signature of Preparer

_____
Print Name of Preparer

_____
Address of Preparer

Page 2 of 2.

_____
Initials of First Party

AHAAZBZB

Exhibit B

**Schedule A Description**

Saxony Title

Title Number ST-REC-218

Page 1

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Brooklyn, County of Kings, City and State of New York, bounded and described as follows;

BEGINNING at a point on the Northerly side of Lincoln Place, distant 133 feet Westerly from the corner formed by the Northerly side of Lincoln Place with the Westerly side of Kingston Avenue;

RUNNING THENCE Northerly parallel with Kingston Avenue and part of the distance through a party wall 100 feet;

THENCE Westerly parallel with Lincoln Place 20 feet;

THENCE Southerly parallel with Kingston Avenue and part of the distance through a party wall 100 feet to the Northerly side of Lincoln Place;

THENCE Easterly along the Northerly side of Lincoln Place 20 feet to the point or place of BEGINNING.

| NYC DEPARTMENT OF FINANCE<br>OFFICE OF THE CITY REGISTER |  |
|---|---|

2012123100507001001S9424

| **SUPPORTING DOCUMENT COVER PAGE** | **PAGE 1 OF 1** |
|---|---|

**Document ID: 2012123100507001**   Document Date: 12-19-2012   Preparation Date: 12-31-2012
Document Type: DEED

**ASSOCIATED TAX FORM ID: 2012122700377**

**SUPPORTING DOCUMENTS SUBMITTED:**

|  | Page Count |
|---|---|
| DEP CUSTOMER REGISTRATION FORM FOR WATER AND SEWER BILLING | 1 |
| RP - 5217 REAL PROPERTY TRANSFER REPORT | 2 |
| SMOKE DETECTOR AFFIDAVIT | 1 |

**FOR CITY USE ONLY**

CITY REGISTER

**C1. County Code** [          ]  **C2. Date Deed Recorded** [          ] Month Day Year

**C3. Book OR** [          ]  **C4.** DEC 31 2012

**C5. CRFN** [          ]

**REAL PROPERTY TRANSFER REPORT**
STATE OF NEW YORK
STATE BOARD OF REAL PROPERTY SERVICES

# RP - 5217NYC

## PROPERTY INFORMATION

**1. Property Location** | 1019 | LINCOLN PLACE | BROOKLYN | 11213
STREET NUMBER | STREET NAME | BOROUGH | ZIP CODE

**2. Buyer Name** | 1019 LINCOLN LLC
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**3. Tax Billing Address** Indicate where future Tax Bills are to be sent if other than buyer address (at bottom of form)
LAST NAME / COMPANY | FIRST NAME
STREET NUMBER AND STREET NAME | CITY OR TOWN | STATE | ZIP CODE

**4. Indicate the number of Assessment Roll parcels transferred on the deed** [ 1 ] # of Parcels OR [ ] Part of a Parcel

**4A.** Planning Board Approval - N/A for NYC
**4B.** Agricultural District Notice - N/A for NYC

**5. Deed Property Size** [          ] FRONT FEET X [          ] DEPTH OR [          ] ACRES

Check the boxes below as they apply:
**6.** Ownership Type is Condominium [ ]
**7.** New Construction on Vacant Land [ ]

**8. Seller Name** | GOPIN | JOSEPH
LAST NAME / COMPANY | FIRST NAME

LAST NAME / COMPANY | FIRST NAME

**9. Check the box below which most accurately describes the use of the property at the time of sale:**

A [ ] One Family Residential | C [ ] Residential Vacant Land | E [ ] Commercial | G [ ] Entertainment / Amusement | I [ ] Industrial
B [✓] 2 or 3 Family Residential | D [ ] Non-Residential Vacant Land | F [ ] Apartment | H [ ] Community Service | [ ] Public Service

## SALE INFORMATION

**10. Sale Contract Date** 12 / 19 / 2012
Month Day Year

**11. Date of Sale / Transfer** 12 / 19 / 2012
Month Day Year

**12. Full Sale Price** $ 1 0 0 0 0

( Full Sale Price is the total amount paid for the property including personal property. This payment may be in the form of cash, other property or goods, or the assumption of mortgages or other obligations.) *Please round to the nearest whole dollar amount.*

**13. Indicate the value of personal property included in the sale**

**14. Check one or more of these conditions as applicable to transfer:**

A [ ] Sale Between Relatives or Former Relatives
B [ ] Sale Between Related Companies or Partners in Business
C [ ] One of the Buyers is also a Seller
D [ ] Buyer or Seller is Government Agency or Lending Institution
E [ ] Deed Type not Warranty or Bargain and Sale (Specify Below )
F [ ] Sale of Fractional or Less than Fee Interest ( Specify Below )
G [ ] Significant Change in Property Between Taxable Status and Sale Dates
H [ ] Sale of Business is Included in Sale Price
I [ ] Other Unusual Factors Affecting Sale Price ( Specify Below )
J [✓] None

## ASSESSMENT INFORMATION  - Data should reflect the latest Final Assessment Roll and Tax Bill

**15. Building Class** [ B 1 ]  **16. Total Assessed Value** (of all parcels in transfer) 2 4 3 3 0

**17. Borough, Block and Lot / Roll Identifier(s)** ( If more than three, attach sheet with additional Identifier(s) )

BROOKLYN 1257 84

| CERTIFICATION | I certify that all of the items of information entered on this form are true and correct (to the best of my knowledge and belief) and understand that the making of any willful false statement of material fact herein will subject me to the provisions of the penal law relative to the making and filing of false instruments. |

**BUYER**

BUYER SIGNATURE                              DATE

7561 SHERIDAN STREET

STREET NUMBER          STREET NAME (AFTER SALE)

HOLLYWOOD                    FL          33024

CITY OR TOWN                 STATE      ZIP CODE

Joseph Katzoff
Notary Public State of New York
Qualified in Kings County no. 24-6013359
Commission Expires September 14, 2014

12-27-12

**BUYER'S ATTORNEY**

SAXONY TITLE SERVICES, LLC

FIRST NAME

718     692-1800

AREA CODE     TELEPHONE NUMBER

**SELLER**

SELLER SIGNATURE                              DATE

Joseph Katzoff
Notary Public State of New York
Qualified in Kings County no. 24-6013359
Commission Expires September 14, 2014

2012122700377201

# AFFIDAVIT OF COMPLIANCE
## WITH SMOKE DETECTOR REQUIREMENT
## FOR ONE- AND TWO-FAMILY DWELLINGS

State of New York    )
County of   K. U |)  ) SS.:

The undersigned, being duly sworn, depose and say under penalty of perjury that they are the grantor and grantee of the real property or of the cooperative shares in a cooperative corporation owning real property located at

1019  LINCOLN PLACE

Street Address            Unit/Apt.

BROOKLYN     New York,    1257     84    (the "Premises");

Borough             Block       Lot

That the Premises is a one or two family dwelling, or  a cooperative apartment or condominium unit in a one- or two-family dwelling, and that installed in the Premises is an approved and operational smoke detecting device in compliance with the provisions of Article 6 of Subchapter 17 of Chapter 1 of Title 27 of the Administrative Code of the City of New York concerning smoke detecting devices;

That they make affidavit in compliance with New York City Administrative Code Section 11-2105 (g). (The signatures of at least one grantor and one grantee are required, and must be notarized).

_Joseph Lopson_

Name of Grantor (Type or Print)

Signature of Grantor

_Zalman Korf_

Name of Grantee (Type or Print)

Z, korf

Signature of Grantee

Sworn to before me
this ___27___date of __Dec__   20 | 2
Joseph Katzoff
Notary Public State of New York
Qualified in Kings County no. 24-6013359
Commission Expires September 14, 2014

Sworn to before me
this ___27___date of __Dec__   20 | 2
Joseph Katzoff
Notary Public State of New York
Qualified in Kings County no. 24-6013359
Commission Expires September 14, 2014

SEAL

These statements are made with the knowledge that a willfully false representation is unlawful and is punishable as a crime of perjury under Article 210 of the Penal Law.

**NEW YORK CITY REAL PROPERTY TRANSFER TAX RETURNS FILED ON OR AFTER FEBRUARY 6th, 1990, WITH RESPECT TO THE CONVEYANCE OF A ONE- OR TWO-FAMILY DWELLING, OR A COOPERATIVE APARTMENT OR A CONDOMINIUM UNIT IN A ONE- OR TWO-FAMILY DWELLING, WILL NOT BE ACCEPTED FOR FILING UNLESS ACCOMPANIED BY THIS AFFIDAVIT.**

2012122700377101





**The City of New York**
**Department of Environmental Protection**
**Bureau of Customer Services**
**59-17 Junction Boulevard**
**Flushing, NY   11373-5108**

# Customer Registration Form for Water and Sewer Billing

## Property and Owner Information:

(1)   Property receiving service:  BOROUGH:  BROOKLYN          BLOCK: 1257          LOT:  84

(2)   Property  Address: 1019  LINCOLN PLACE, BROOKLYN, NY 11213

(3)  Owner's Name:      1019 LINCOLN LLC

Additional Name:

## Affirmation:

  Your water & sewer bills will be sent to the property address shown above.

## Customer Billing Information:

### Please Note:

A.  Water and sewer charges are the legal responsibility of the owner of a property receiving water and/or sewer service. The owner's responsibility to pay such charges is not affected by any lease, license or other arrangement, or any assignment of responsibility for payment of such charges. Water and sewer charges constitute a lien on the property until paid. In addition to legal action against the owner, a failure to pay such charges when due may result in foreclosure of the lien by the City of New York, the property being placed in a lien sale by the City or Service Termination.

B.  Original bills for water and/or sewer service will be mailed to the owner, **at the property address or to an alternate mailing address**.  DEP will provide a duplicate copy of bills to one other party (such as a managing agent), however, any failure or delay by DEP in providing duplicate copies of bills shall in no way  relieve the owner from his/her liability to pay all outstanding water and sewer charges. Contact DEP at (718) 595-7000 during business hours or visit www.nyc.gov/dep to provide us with the other party's information.

## Owner's Approval:

The undersigned certifies that he/she/it is the owner of the property receiving service referenced above; that he/she/it has read and understands Paragraphs A & B under the section captioned "Customer Billing Information"; and that the information supplied by the undersigned on this form is true and complete to the best of his/her/its knowledge.

Print Name of Owner:

Signature: _____          Date (mm/dd/yyyy)

Name and Title of Person Signing for Owner, if applicable:

BCS-7CRF-ACRIS   REV. 8/08

2012122700377101